UNITED STATES MAGISTRATE COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division


DEBORAH WEYMOUTH, ET AL          }
                                 }
v.                               }    Civil Action No.
                                 }    3:14 CV 419
COUNTY OF HENRICO, VIRGINIA      }


                                      July 14, 2015


**COMPLETE TRANSCRIPT OF SUMMARY JUDGMENT MOTIONS**
**BEFORE THE HONORABLE RODERICK C. YOUNG**
**UNITED STATES MAGISTRATE COURT JUDGE**


APPEARANCES:

Harris D. Butler, III, Esquire
BUTLER ROYALS PLC
140 Virginia Street, Suite 302
Richmond, Virginia  23219
and
Craig J. Curwood, Esquire
Philip J. Dean, Esquire
CURWOOD LAW FIRM PLC
530 East Main Street, Suite 710
Richmond, Virginia  23219

        Counsel on behalf of Deborah Weymouth, et al.


Lee Ann Anderson, Esquire
HENRICO COUNTY ATTORNEY'S OFFICE
Post Office Box 90775
Henrico, Virginia  23273-0775

        Counsel on behalf of County of Henrico, Virginia


                KRISTA L. HARDING, RMR
                OFFICIAL COURT REPORTER
            UNITED STATES MAGISTRATE COURT

1     (The proceeding commenced at 1:48 p.m.)

2     THE CLERK:  Civil Case Number 14 CV 419.  *Deborah*

3 *Weymouth, et al, v. County of Henrico, Virginia.*

4     The plaintiff is represented by Mr. Harris D. Butler,

5 III, Mr. Craig J. Curwood, and Mr. Philip J. Dean.

6     The defendant is represented by Lee Ann Anderson.

7     Are counsel ready to proceed?

8     MR. BUTLER:  Ready, Your Honor.

9     MS. ANDERSON:  Yes.

10     THE COURT:  All right.  Good afternoon.

11     So we're here on the matter of Weymouth v. County of

12 Henrico.  And this matter has been referred to me by Judge

13 Payne for resolution of summary judgment motions going

14 both ways.  I believe the defendant has filed, and the

15 plaintiff has filed, for summary judgment.

16     So having said that, I'd like to first hear from the

17 plaintiff.  So if you would come forward.

18     MR. BUTLER:  Sure.

19     THE COURT:  And the first question I have for you is

20 as you're coming forward is that in the next, you know,

21 thirty seconds to three minutes, just give me the *Reader's*

22 *Digest* version of why the Court should grant summary

23 judgment for the plaintiff.

24     MR. BUTLER:  Certainly, Your Honor.

25     And it really lies in the burden of proof.  Under the

1  Fair Labor Standards Act, the employees are typically

2  presumed to be covered by the Act unless a defendant

3  employer can prove by the burden of clear and convincing

4  evidence that they're entitled to an exemption.  The

5  exemption that the County claims in this matter is the

6  executive exemption, and they base that on the fact that

7  they say fire station captains are exempt because of

8  their, as the County would put it, largely managerial

9  functions.

10     What we believe that the County overlooks is the 2004

11  amendments to the federal regulations.  What -- after

12  post-9\11, it was -- there was a regulation enacted that

13  addressed first responders.  And that regulation says that

14  irrespective of rank, first responder duties may not be

15  considered managerial.

16     So the issue, the crux of this case, is whether the

17  defendant may show, or has offered any proof, by clear and

18  convincing evidence, of their exemption.  And we say they

19  have not, and that's why we're entitled to summary

20  judgment on that point.

21     THE COURT:  So let me ask you this.  If the defendant

22  satisfies the executive capacity test, which includes this

23  primary duty test, do they win?

24     MR. BUTLER:  Well, they only satisfy that -- the

25  answer is if they -- if they demonstrate primary duty is

1  management then, yes, they win.  They've met their burden

2  under clear and convincing evidence to that.  However,

3  where the County --

4      THE COURT:  So if they satisfy that and they show

5  that the captains' primary duty is management, then no

6  overtime, correct?

7      MR. BUTLER:  That's correct, Your Honor.

8      THE COURT:  All right.  And if they don't show that

9  then --

10      MR. BUTLER:  Well, and the reason that -- well, we

11  don't think it's quite as simple as Henrico County has

12  urged in their papers.  They would say that this First

13  Responder Regulation from 2004 need not be addressed or

14  met.  And they say that because they say that we meet the

15  primary duty test, and that we're entitled to our

16  exemption without regard to the First Responder

17  Regulation.

18      They basically say that we can ignore the fact that

19  these fire captains are sent out on responses.  That the

20  preparedness that goes on in the fire station is not part

21  of, under their view of the world, first response and need

22  not be considered.  That because they have an

23  organizational chart that places the fire captain, which

24  is the second-tier supervisor over the lieutenant and then

25  the fire captain, that because of their organizational

1  chart position that they need go no further.  And that's

2  belied by 2004, just prior to the enactment of this

3  amendment.

4       The County Attorney's Office in Henrico looked at

5  this issue.  And they looked at it from a budgetary

6  standpoint because they were going to have to spend the

7  estimated about $300,000 a year.  So in the last 10 years,

8  Henrico County has saved $3 million by not paying fire

9  captains overtime as we believe the First Responder

10 Regulation requires, as most Virginia jurisdictions have

11 adopted.

12      THE COURT:  Let me ask you this.  Are captains

13 required to participate in firefighting?

14      MR. BUTLER:  Yes.  I mean, they actually -- because

15 of minimum staffing and the budget, which is again the

16 driving concern here, often -- trucks go out with three

17 people.  They go out with a lieutenant, generally who

18 drives.  They go out with a captain and a firefighter.

19 And other staff -- you know, if a lieutenant is not on, a

20 firefighter will drive.

21      But they have a rule that whoever drives the

22 apparatus, the fire engine, must stay with the engine.

23 That leaves a captain, generally, and firefighter to go

24 into the scene.

25      They have a rule of two in two out for safety

1   reasons.  The fire captain is doing hands-on front-line

2   firefighting, as well as the preparedness that happens in

3   the --

4       THE COURT:  So it's your position that they're

5   mandated?  Not that they choose to, because that's a

6   different question, not that they choose to participate in

7   firefighting, but they're mandated to participate?

8       MR. BUTLER:  The testimony from our clients would be

9   that if they did not respond that they would be

10  disciplined.  The County argues that they have discretion.

11  That they can choose when to go and not to go.  And that's

12  just factually not the case.

13      From a -- if for nothing more from an organization

14  chart standpoint, you know, that's the County's argument.

15  From a budgetary standpoint, from a minimum staffing

16  standpoint, there aren't enough bodies to do that.

17      THE COURT:  Okay.  Are captains evaluated on their

18  firefighting abilities?  So when they have their yearly

19  evaluation, are they evaluated on firefighting, or are

20  they evaluated on their management team?

21      MR. BUTLER:  Part of their job classification and job

22  description that the County relies upon includes, by the

23  County's own assessment, 30% daily of hazardous responses

24  be it fire or emergency.

25      THE COURT:  Is the primary duty of the captain to

1  participate in firefighting, or is the primary duty to

2  manage the fire station?

3      MR. BUTLER:  Well, that's the crux of the issue

4  before the Court.  The primary duty, we believe, according

5  to the First Responder Regulation, is that their primary

6  duty is to fight fires.  And there's no question this

7  record has evidence from, you know, both they do have

8  managerial roles, they have firefighting roles.

9      The County would minimize the firefighting roles.  We

10  tend to maximize the value of the interest of firefighting

11  and first response.

12      The reason that we have fire stations that are --

13  when a buzzer sounds, able to get out immediately a first

14  response, be it a fire, accident scene, crime scene, is

15  because everything that happens in that firehouse is for

16  preparedness to be able to go at a moment's notice.

17      It is as one court that we cite, the *Barrows* court,

18  it's the Eastern District of Chattanooga, in a 2013 case,

19  *Barrows v. City of Chattanooga*.  It says the nature of the

20  job is to wait.  *"Extended periods of boredom, punctuated*

21  *by periods of urgency and moments of terror."*

22      That court said that you cannot divorce preparedness

23  at the station from the ability to go at a moment's notice

24  and to respond to an emergency situation.  That if you did

25  not have the preparedness, they could not go when the

1  buzzer sounded.  They would have to gas vehicles, they

2  would have to prepare equipment, and all of that

3  preparedness is part of, and inextricably intertwined,

4  with the ability and the requirement to respond to the

5  emergency when it's alerted.

6      The *Barrows* court said that in looking at the primary

7  duty, you must view preparedness and the first response

8  time in order to determine that -- and in this case,

9  *Barrows*, the court decided that the captains under their

10  First Responder Regulation could not be considered

11  managerial.

12      THE COURT:  In Henrico, do the captains engage in the

13  same front-line activities that their subordinates do?

14      MR. BUTLER:  Absolutely.  When they're on -- when

15  they're on shift, when they're on duty, they go with the

16  truck.  They do the same firehose.  They're another

17  firefighter on the scene.

18      THE COURT:  All right.  How much time do the captains

19  perform managerial work, and how much time do they devote

20  to non-managerial work?  So if you take a 40-hour work

21  week -

22      MR. BUTLER:  That gets to --

23      THE COURT:  - not saying -- just let me finish.

24      - not saying hours, but percentage.

25      MR. BUTLER:  Right.  Well, that gets to what you

1   count.  You know, if you count -- as the County would have

2   it, if you count all the preparedness functions, they

3   would say that everything they do, that every moment

4   they're watching a firefighter to evaluate, that every

5   moment -- even though the evaluation, the testimony has

6   been, is only, you know, several hours a year.  So if you

7   look at the hours worked versus the hours time to prepare

8   the evaluation, very little time.

9        If you look at what happens in the firehouse, again,

10  it comes down to this question.  Is this preparedness?  As

11  the *Barrows* court would say, is it essential to the

12  response time, or is it time that is involved in

13  management?  And that's the -- the crux of this case.

14       We believe that given the First Responder Regulation,

15  Henrico cannot meet its clear and convincing burden on its

16  exemption.  And it does not get -- the tie does not go to

17  the County on this.  They must meet, by clear and

18  convincing evidence, their affirmative defense of this

19  exemption in order to avoid an overtime obligation.

20       THE COURT:  Do captains have freedom from

21  supervision, or do they carry out orders from those above

22  them?

23       MR. BUTLER:  They report to a battalion chief.  It's

24  a command structure.  And as you're no doubt familiar, you

25  know, while each level has its own -- in a command

1   structure has its own degree of autonomy, and its own

2   degree of, you know, reporting a climb, in a command

3   structure, uniquely much of what is done in that

4   structure, for instance discipline, transfers, you know,

5   captains have no ultimate authority in those matters.  It

6   all is above them.

7       But the County raises in their papers an interesting

8   analogy.  It is that, you know, in a school situation that

9   a principal would say our responsibility -- our primary

10  duty is educating children.  But if you look at it, who's

11  educating the children are the teachers.  So they would

12  say the -- in that situation, which they liken to this,

13  that the principal, the fire captain, would be management;

14  the teacher, the firefighter, would be nonmanagement.

15  Aside from the fact that a different professional

16  exemption applies to school teachers, it's an interesting

17  analogy.

18      The better analogy is a command structure.  That

19  would be a Marine unit out in the field.  You have a

20  captain, a lieutenant, a sergeant, and officers, infantry

21  officers, in the field.  All of them in the line of fire.

22  All of them -- even the second and third tiers of

23  "*supervision*" are actively engaged in front-line work as

24  Marines or infantry.  That's more analogous in a command

25  structure.

1        There is back at the base a colonel, or somebody,

2   which is akin to the battalion chief.   The battalion chief

3   does not do the -- does not ride on the truck, does not go

4   to -- they go to the fire, but they're looking at command

5   of the overall scene.   That would be management.

6        Even though they do first response duties, you know,

7   they're not hands-on first response like fire captains.

8   That distinction is -- you know, the County says our

9   argument is that everybody who touches a first response

10  scene is exempt.   That's not true.   It's still a primary

11  duties test.   It's just the primary duties test must be

12  viewed through the lens of the First Responder Regulation

13  that says irrespective of rank or grade, first responders,

14  you know, particularly first responders doing on-scene

15  response, that time cannot be viewed as managerial.   They

16  view the on-scene response as managerial.

17       The deeper question here, of course, is the

18  preparedness piece, and whether the station time is

19  supervision managerial.   And that really will factor one

20  way or the other how this case goes on these -- on the

21  exemption.

22       I will note that the cases that the defense cites

23  largely were tried by juries.   They weren't -- they didn't

24  go out on summary judgment.

25       THE COURT:   All right.   Let me ask you this.   How do

1  captains' salaries compare to those other employees?

2      MR. BUTLER:  Their base pay is more than the

3  lieutenants.  The lieutenants with overtime -- we don't

4  have all the numbers on this, but we have testimony that

5  lieutenants have said, you know, I don't want to be

6  promoted because I'll make less because with overtime we

7  think that --

8      THE COURT:  What's the difference in the base pay

9  between a captain and a lieutenant?

10     MR. BUTLER:  You know, I don't have that.  I'm sure

11  Ms. Anderson does.  It's in their -- in their papers.  But

12  I know that the captain has a higher base pay than a

13  lieutenant.

14     THE COURT:  All right.  Do captains have any control

15  over any other employees in the fire station?

16     MR. BUTLER:  They do have, you know, control over

17  certain assignments in the station.  I mean, it's -- you

18  know, could not be said that they have no supervision over

19  the firefighters.  They're really like working foreman.

20  And that gets to our good faith issue.

21     THE COURT:  Do they do any training?

22     MR. BUTLER:  They do training.  They also are trained

23  to participate in training that they don't do.  In fact,

24  in our facts --

25     THE COURT:  So who are they training?  Other

1  firefighters and lieutenants?

2        MR. BUTLER:  They would train other firefighters.  As

3  well as, you know, other firefighters and lieutenants also

4  lead training.  So it's not exclusive to captains that

5  train.

6        THE COURT:  Do they direct the work of any employees?

7        MR. BUTLER:  They certainly direct work of

8  firefighters.  Of course, any work that's directed on the

9  scene is, you know, in the First Responder Reg.

10        THE COURT:  All right.  Do they evaluate any other

11  firefighters?

12        MR. BUTLER:  They do not perform the evaluations.

13  The lieutenants do that.  But they approve the evaluations

14  as it goes up through the chain.

15        THE COURT:  Do they handle any grievances?

16        MR. BUTLER:  They are -- they may be involved as

17  witnesses.  But generally that's higher in the command

18  structure.  They can make recommendations, but they

19  typically are not the front-line HR, in other words, for

20  the -- for the station.

21        THE COURT:  Do they have to handle any type of

22  discipline?

23        MR. BUTLER:  They can't impose.  They can recommend.

24  They can't impose transfers.  They can't terminate on

25  their own.  But that all, again, in a command structure

1   comes from above.

2       THE COURT:  Do they assign any work to any other

3   employees?

4       MR. BUTLER:  They certainly can assign work, although

5   they participate in the work as well.  And again, the

6   First Responder Reg would say that irrespective of their

7   ability to direct with regard to first response matters,

8   that time cannot be considered managerial under the

9   regulation.

10      THE COURT:  Pivoting to the fire station for a

11  minute.  Do they have any control over the records and

12  statistics in the fire station?

13      MR. BUTLER:  They are required in some instances to

14  prepare reports, post-incident reports.  Of course the

15  First Responder Regulation says that those are also

16  nonexempt activities.  Anything related to fire

17  suppression, or reports or investigations subsequent to.

18  But they also provide, you know, they do -- they have

19  normal administrative tasks.

20      THE COURT:  What about fire drills?  Do they have any

21  involvement in the timing of fire drills?

22      MR. BUTLER:  Fire drills for training for the

23  officers?

24      THE COURT:  Yes.

25      MR. BUTLER:  Henrico has a separate division of

1   training.   And I think they're the primary -- I mean, they

2   run the academy.   And they also run most of the training.

3   A captain or lieutenant, or anyone else, I think a

4   firefighter can request that their unit receive training

5   at the fire training facility.   Or I think there's two

6   facilities.

7         But there are, I think on occasion, training that the

8   captains are involved with, but that is also -- it moves

9   around.   I mean, it's -- I think in practice the fire

10  station is somewhat egalitarian.   I mean, it -- they shift

11  responsibilities and duties.

12        Now, the County would say that's because the captain

13  elects, you know, to participate in those.   But the issue

14  of preparedness is not an elective.   I mean, they must

15  have -- they are the ultimate captain of the ship in terms

16  of that station.   They're the top on-the-scene

17  administrator.

18        THE COURT:   Do they have any control over the budget?

19        MR. BUTLER:   They have limited control.   If they have

20  a specialty unit in their station, then they have

21  involvement with the budgetary process for that specialty

22  unit, if there's supplies that are needed for that

23  specialty unit.

24        But their budget, their payroll is driven by the

25  budget office in the County in the fire division that they

1   have.   You know, the testimony is they have very limited

2   involvement in the day-to-day budget except for kind of

3   the wish list that they put together for their specialty

4   unit, if that have a specialty unit.   Not all stations

5   have specialty units.

6        THE COURT:   All right.   Would you characterize the

7   captains' duties in the fire station, on the scene, their

8   duties in total, as mixed?   That they have mixed duties?

9        MR. BUTLER:   Absolutely.   They have -- they're mixed

10  in terms of -- and I think the working foreman model is

11  the most appropriate.

12       THE COURT:   Okay.   So when you argue that a captain

13  is entitled to overtime, is your argument based on the

14  fact that their entitled to overtime is based on the way

15  their job description is laid out, or they're entitled to

16  overtime based on what they actually do in their job?

17       MR. BUTLER:   The Department of Labor is very clear on

18  this.   The title or label that you hang on somebody is of

19  no effect.   The duties and functions that are performed is

20  what matters.

21       And with fire -- because of this First Responder

22  Regulation -- you know, I think this is a different case

23  without the First Responder Regulation.   I mean, I don't

24  think the County would have any difficulty proving that a

25  captain that does these mixed working foreman type

1   functions may well be a manager under the general test in

2   the law absent the First Responder Regulation.

3       But with the First Responder Regulation, and the

4   reason that so many jurisdictions, except for Henrico,

5   have fallen in line and are compensating captains as

6   nonexempt is because you cannot do as the County has done,

7   and that is to actively avoid paying overtime to captains.

8   Because they viewed in 2004, and this is in the papers, an

9   internal memorandum that they rely on for their supposedly

10  good faith to avoid a third year of liability, they're

11  saying that we looked at this before the First Responder

12  Regulation was to be implemented, and we determined that

13  working foremen were to be paid comp -- were to be

14  compensated overtime.

15      Then they unilaterally, without any support, say but

16  we believe captains are senior executives and therefore

17  not entitled to overtime.  There's no factual support from

18  2004 to date.  They have not gone in and done any time

19  motion studies.  They've not gone and checked to see what

20  the duties are.  And that is a failure that subjects the

21  County to not only liquidated damages, which are presumed

22  when overtime is not paid when due, but a third year of

23  liability for willfulness.

24      THE COURT:  Is there a written job description for a

25  captain?

1    MR. BUTLER:  There's a job description that the

2  County has put together, as well as a classification

3  document.  And those two documents are what we have gone

4  through with deponents in the discovery to look at what

5  the County sets out as -- and those documents set out that

6  the captains have ultimate responsibility for many things.

7    THE COURT:  All right.  And I'll ask about  -- I'll

8  dig into that with Henrico in a little bit -

9    MR. BUTLER:  Okay.

10    THE COURT:  - when we get to that.

11    So let me ask this.  Is it part of the captains' job

12  duties to make suggestions and recommendations regarding

13  hiring and firing?

14    MR. BUTLER:  They can make suggestions, although the

15  testimony in the record is that they're not given

16  *particular weight,*" which is the standard.  There are

17  examples in which -- so promotion in the fire department,

18  because it's a command structure, because it's public

19  service, is by competitive examination and interview.

20  There's an interview panel that is comprised -- and

21  captains are not required to be on interview panels.  In

22  fact, two of the four plaintiffs have never served on an

23  interview panel.

24    There's a situation in which Ms. Weymouth, Captain

25  Weymouth, the plaintiff, had recommended someone to the

1  chief, and that recommendation, even though it came from

2  the interview panel, was rejected.  So in a command

3  structure, the chief is really where the buck stops.  The

4  chief gets to dictate and accept or not accept what

5  happens.

6      Discipline cannot be imposed by a chief -- by a

7  captain.  Transfers cannot be unilaterally imposed by a

8  captain.  Everything comes from above.  They do have

9  input.  They may or may not be asked.  There's testimony

10  by one of our plaintiffs that they've never been asked by

11  the chief for on, you know, lieutenants that have been

12  promoted out of their station to captain.  They never got

13  a call.

14      The County says that the -- and the chief supplied an

15  affidavit saying that he regularly calls and asks for

16  input.  So, you know, that's at a minimum a fact question.

17      THE COURT:  So it's your position that captains don't

18  directly hire or fire?

19      MR. BUTLER:  They do not.  That's uncontested.  The

20  County --

21      THE COURT:  But they do have the ability to evaluate

22  employes, is that correct, once they're hired?

23      MR. BUTLER:  They sign off on lieutenants'

24  evaluations.

25      THE COURT:  All right.  Okay.  All right.

1          Let's see.  What do captains do at firefighting

2     scenes?

3          MR. BUTLER:  They do the same things that the

4     firefighters and lieutenants do.  They enter the building.

5     They suppress fires.  They pull the hose.  They use

6     ladders.  I mean, they are another two hands on the fire

7     scene.  They're providing first response.

8          THE COURT:  Okay.  Now, I think it was your brief

9     that made the point that captains aren't necessarily in

10    charge of the firefighting scene when they get there.

11    It's kind of based on where they're sitting in the

12    vehicle.

13         MR. BUTLER:  There's a hierarchy on the engine on

14    where the -- you know, who sits in what is in command of

15    the engine.  And that may or may not be the captain.  That

16    was that point.  They clearly have the right, you know.

17    And if they desire to pull rank, you know, they could.

18    But the First Responder --

19         THE COURT:  So they're still the captain?

20         MR. BUTLER:  They're still the captain.  And they're

21    not delegating, you know, or advocating their role.

22         But, you know, under the First Responder Regulation,

23    none of that time may be considered management, and, you

24    know, the County wants to consider that as management.

25         THE COURT:  All right.  Well, let me give you this

1  analogy.  So in a former life I was a supervisor in the

2  United States Attorney's Office.  And when I was there, as

3  a supervisor I didn't have to try cases.  I had five

4  attorneys that worked for me who tried cases.  Now, I

5  still tried cases.

6      So under your view of the case, would that make me

7  not a manager because I had a full caseload?

8      MR. BUTLER:  Well, I think in order to apply that you

9  would have to be applying it as a first responder because

10  this First Responder Regulation really is, you know, the

11  key.

12      The fact that -- so what the Department of Labor

13  would say outside of the first responder context would be

14  that if a manager performs some incidental duties -- I

15  mean, there's a case, *Family Dollar*, a 2011 case, with the

16  Fourth Circuit where they looked at assistant managers who

17  also did stock shelf stocking and cash register duties.

18  There's also an Eleventh Circuit *Family Dollar* case that

19  goes the other way and says that you have to look at the

20  duties.

21      But the test under the Department of Labor

22  regulations is duties.  So if you are a manager and you

23  are both doing a manager role the majority of your time,

24  and also nonmanagerial duties, you're still a manager.

25  You're still exempt.  But that's, you know, not the lense

1   that this case must be viewed through because of the --

2       THE COURT:  So you're saying when I was at the U.S.

3   Attorney's Office I will still a manager?

4       MR. BUTLER:  You're a still a manager.

5       THE COURT:  Okay.  So why isn't a captain a manager?

6       MR. BUTLER:  Because of the First Responder

7   Regulation.  And that changes the ballgame here.  And that

8   is because the Department of Labor, through a notice and

9   comment period, put out this regulation.  It's 29 CFR

10  541.3, scope of the Section 13(a)(1) exemptions.

11      And in 2004, there were amendments to the

12  white-collar exemptions to try to clarify how these

13  exemptions would apply.  And the Department of Labor

14  wanted to be sure that they were not over, you know,

15  misapplied and so they did two things.

16      They said in (a) that they talk about a blue-collar

17  exemption.  They say if you're a blue-collar worker, then,

18  you know, they list several types of carpenters, plumbers,

19  types of occupations.  And you're going to be entitled to

20  overtime.

21      Then in (b) they said also if you're a firefighter it

22  says -- the Section 13(a)(1) exemptions.  The white-collar

23  exemptions.  And the regulations said in this part do not

24  apply to "*fire fighters, paramedics, emergency medical*

25  *technicians, ambulance personnel, rescue workers,*

1 *hazardous materials workers and similar employees,*

2 *regardless of rank or pay level who perform work such as*

3 *preventing, controlling, or extinguishing fires of any*

4 *type; rescuing fire, crime or accident victims; conducting*

5 *investigations,"* et cetera.

6      And they say in (2) and (3), sub (2) and (3) that is,

7 they're not to be considered exempt because their primary

8 duty there is fighting fires.  Not as first responders.

9 Not as management.

10      So that regulation is the lens through which a fire

11 captain who performs first response duties as a working

12 foreman, because they do both.  There's no question they

13 do some managerial roles --

14      THE COURT:  So it's your view that the captains are

15 blue-collar workers?

16      MR. BUTLER:  No.  The blue-collar analysis is -- in

17 fact, that's the analysis that Judge Hilton used, we think

18 incorrectly, in the Fairfax case.  The blue-collar

19 exemption talks to -- or the fact that blue-collar workers

20 shall not be considered as managerial is a separate and

21 distinct category from the following paragraph which talks

22 to fire personnel.

23      What Judge Hilton did is he conflated the two and he

24 said that in order to be -- in order to be protected under

25 the -- or entitled to overtime, as a firefighter you have

1  to be a *"blue-collar firefighter"*.  There's no case that

2  Judge Hilton cites for support of that.  It's -- there's

3  no case that can be supported.

4      THE COURT:  As a general matter though, as a general

5  matter when it comes to overtime, isn't it such that

6  generally blue-collar workers are more entitled to

7  overtime than traditional white-collar workers?

8      MR. BUTLER:  Well, that's -- that's the purpose of

9  this particular -- that's to clarify that.  I mean, this

10  particular regulation in 2004 said blue-collar workers --

11  and they have a list of, you know, it's *"carpenters,*

12  *electricians, mechanics, plumbers, iron workers,*

13  *craftsmen, operating engineers, longshoremen"* --

14      COURT REPORTER:  Mr. Butler --

15      MR. BUTLER:  I'm sorry.

16      THE COURT:  You can't talk faster than she can type.

17      MR. BUTLER:  *"Carpenters, electricians, mechanics,*

18  *plumbers, iron workers, craftsmen, operating engineers,*

19  *longshoreman, construction workers and laborers are*

20  *entitled to minimum wage and overtime"* pay and are not

21  exempt.

22      It then goes on in a second clarifying statement to

23  say these exemptions also do not apply to police officers,

24  firefighters, et cetera.  They don't combine the two.

25      They make it clear that blue-collar workers are to be

1 exempt.  Then they make it clear that under this First

2 Responder Regulation, irrespective of rank --

3     THE COURT:  What color is the shirt that firefighters

4 wear?

5     MR. BUTLER:  You know, they just -- they had a

6 change.  I think it's blue.  And I think the captains had

7 worn blue and now they're white.

8     THE COURT:  What color does the chief wear?

9     MR. BUTLER:  He's here today.  I think blue.

10     THE COURT:  I think white.

11     MR. BUTLER:  Oh, shirt?  Okay.  White.

12     I thought you meant the outside uniforms.

13     THE COURT:  Okay.

14     MR. BUTLER:  But I think that they changed that, you

15 know, to -- you know, after the suit.  Now they say that

16 that's because the captains had asked for it.  You know,

17 that's not the point.  The point of the side in the brief

18 was that that change had not been made until after

19 litigation.

20     Now, irrespective of why or who wanted it, it was to

21 create an outward appearance of, you know, more managerial

22 than firefighter.

23     THE COURT:  Okay.  Is there anything else you want to

24 tell me before I hear from Henrico's counsel?

25     MR. BUTLER:  Well, I think that the information

1  that's in the County's file from 2004 when they were

2  looking at this regulation, the First Responder Regulation

3  coming into law, they accumulated -- Mr. Cobbell, who was

4  the Director of Human Resources in Henrico County at the

5  time, accumulated a number of articles that talk about the

6  upcoming regulatory change and how it will apply to

7  firefighters and fire captains, first responders under

8  this regulation.  These treatises, including a Fair Labor

9  Standards Handbook, including, you know, something from

10  Thompson Publishing, including something from a Fair Labor

11  Standards Act, you know, publications.  So, I mean,

12  they're learned treatises in the area.  All without

13  exception say that presumptively first responders are to

14  be nonexempt or to be paid overtime.

15      They have Power Points from law firms included in

16  these materials that say, again, presumptively,

17  firefighters are to be included as nonexempt.

18      The jurisdictions -- and there's a declaration from

19  our brief --

20      THE COURT:  Why is a captain, though, a first

21  responder as opposed to a --

22      MR. BUTLER:  Because as the Department of Labor

23  regulations require, you have to look at their job

24  function.  And their job function is that they are on the

25  scene.  They are hands-on on the scene.  They are hands-on

1  preparing for the scene just -- they -- the same duties

2  the firefighters perform, the same duties as the

3  lieutenants, both of who are paid overtime and are

4  nonexempt are done by the fire captains.

5      THE COURT:  Okay.

6      MR. BUTLER:  So under the law, and under the

7  regulation, there's really no avoiding the fact that the

8  first responders have to be considered -- fire captains

9  must be considered first responders, some of their duties.

10     The question is, without looking at what those duties

11 are and how the, for instance, station house preparedness

12 relates to the first response duties, which the County

13 never did which means that they have a real problem on

14 good faith.  They have a real problem on willfulness in

15 the third year of exposure because they knew.  They said

16 that they recognized and read that change to say that

17 working foremen should be covered.  They just declared

18 unilaterally, and without any support in the record,

19 declared that captains are high senior executives in their

20 organization done purely off their organizational chart.

21     THE COURT:  Okay.  Thank you, Mr. Harris.

22     MR. BUTLER:  Thank you.

23     THE COURT:  And now let me hear from you,

24 Ms. Anderson.

25     So, same thing.  In the next three minutes, just tell

1    me why Henrico County is entitled to summary judgment.

2        MS. ANDERSON:  Henrico County is entitled to summary

3    judgment because Henrico County has properly classified

4    its fire station captains because their primary duty is

5    management of the fire station and of the fire station's

6    personnel.  Our classification is not dependent upon any

7    of the duties that the fire station captains perform on an

8    emergency scene; therefore, the First Responder Regulation

9    is completely irrelevant to the Court's analysis.

10       And as plaintiff has acknowledged, once you take the

11   First Responder Regulation out of the analysis, we have

12   appropriately met the four factors governing the test as

13   to whether or not our fire station captains are exempt

14   executives under the FLSA.

15       THE COURT:  Okay.  So do you agree with plaintiff

16   that if you satisfy the executive capacity test, which

17   includes this primary duty test, that you prevail?

18       MS. ANDERSON:  Yes.

19       THE COURT:  All right.  Okay.

20       Are captains required to participate in nonmanagement

21   duties?

22       MS. ANDERSON:  No, they are not required to

23   participate in nonmanagement duties.  We have a lot of

24   testimony in the record that our fire station captains are

25   washing trucks, mopping floors, cleaning up around the

 1  station.  That also -- we also have testimony from each of

 2  the plaintiffs --

 3       THE COURT:  Is fighting a fire a nonmanagement duty?

 4       MS. ANDERSON:  Fighting a fire is a nonmanagement

 5  duty.

 6       THE COURT:  Are they required to participate in

 7  firefighting?

 8       MS. ANDERSON:  When they are assigned -- when they

 9  assign themselves to one of the units that responds to a

10  fire, they must participate, yeah.  As a firefighter, they

11  have to respond.

12       THE COURT:  That's a different question.  That's when

13  they assign themselves.

14       MS. ANDERSON:  That's correct.

15       THE COURT:  So under Henrico County regulations, or

16  whatever regulations govern that govern the fire

17  department, I presume a firefighter is required to -

18       MS. ANDERSON:  That's correct.

19       THE COURT:  - fight a fire?

20       MS. ANDERSON:  That's correct.  A firefighter and a

21  lieutenant --

22       THE COURT:  A lieutenant is required to fight fires?

23       MS. ANDERSON:  Yes.

24       THE COURT:  Is a captain required to go out and fight

25  fires?

1    MS. ANDERSON:  A captain is not required to assign

2  themselves to a unit.

3    THE COURT:  All right.

4    MS. ANDERSON:  They have the discretion to remove

5  themselves from the unit.  And as soon as they remove

6  themselves from the unit, they are no longer required to

7  respond to the emergency scene.

8    THE COURT:  Okay.  When fire captains are evaluated,

9  if they have a yearly evaluation or a 6-month evaluation,

10  are they evaluated based on any firefighting

11  participation?

12    MS. ANDERSON:  The Henrico performance evaluations

13  are on a series of issues.  They would be evaluated on

14  their job duties.  The job duties that are outlined in the

15  job description.  Certainly, their management of a fire

16  scene and their performance on a fire scene is a small

17  part of their job duties.

18    But if you take a look at the job description, fire

19  captains are evaluated on how they manage the station

20  house.  How they manage the personnel assigned to the

21  station.  How they manage the budget.  How they are

22  dealing with the construction issues of the station.  How

23  they are ensuring operational readiness of that station.

24  The quality and consistency of training across the three

25  shifts that report to them.  Those are the issues that a

1  fire captain is evaluated on.

2       THE COURT:  When you say with -- first of all, with

3  respect to a job description, is there a job description

4  for captains?

5       MS. ANDERSON:  There is.

6       THE COURT:  And was that included as part of the

7  record?

8       MS. ANDERSON:  Yes, sir.  There is both a class

9  specification and a job description.  A class

10 specification is for the entire captains, including

11 captains that don't serve at stations.  That was included

12 as Exhibit A to the affidavit, Paula Reid affidavit, in

13 support of the defendant's summary judgment motion.

14      And that class spec outlines what the primary purpose

15 of a captain's job is, which is to manage the station.

16 And lists a series of examples of work that when each of

17 the plaintiffs were deposed they all agreed, yes, these

18 are all job functions that I am responsible for that I

19 perform, or otherwise delegate to someone else in my

20 station house, and that I am evaluated on and held

21 accountable for.

22      So there's no dispute whatsoever in the record that

23 the plaintiffs acknowledge these are their job functions.

24 So it's not just a class spec or a class -- a job

25 description that's sitting out there that someone

1  manufactured in HR.  The plaintiffs understand that these

2  are indeed their job responsibilities.

3       THE COURT:  And when you say a job -- "*Class*

4  *Specification For Fire Captain,*" that's what I have here

5  entitled 2-A, I believe?

6       MS. ANDERSON:  Yes, Your Honor.

7       THE COURT:  And then when you say "*Job Description,*"

8  are you referring to a document I have that's entitled

9  2-D?  It says, "*Job Description Essential Function Job*

10 *Evaluation.*"

11      MS. ANDERSON:  I believe it is at 2-C, the Reid

12 affidavit.

13      There is -- 2-A is the current class specification.

14 At 2-C is the current job description for Plaintiff

15 Hughes.

16      THE COURT:  Okay.

17      MS. ANDERSON:  2-D, Your Honor, is a prior job

18 description that the captains of -- that the current job

19 description is based on.  But that the captains holding

20 the jobs in prior decades said, in their own handwriting,

21 these are my job duties and this is what I think is the

22 most important job function.

23      THE COURT:  Yes.  If a captain assigns themself of a

24 duty of fighting fires -

25      MS. ANDERSON:  Yes.

1    THE COURT:  - is his primary, his or her primary,

2  duty to extinguish fires and rescue victims, or is his or

3  her primary duty to manage the fire station?

4    MS. ANDERSON:  On the day that a fire captain sits on

5  that engine, his perhaps most urgent task and his primary

6  concern ought to be fighting the fire and dealing with the

7  citizens of -- and attending to that emergency scene.

8  That does not, however, translate or change his primary

9  duty as a station captain for all of the other days that

10  he is station captain.

11    THE COURT:  All right.  How much time do captains

12  spend -- and this is presuming that they've assigned

13  themselves to a fire engine to fight fire.  How much of

14  their time percentage-wise is performing managerial

15  duties, and how much of their time is performing

16  nonmanagerial duties, including the firefighting, but

17  including cutting the grass, washing the fire engine,

18  or duties that they could normally assign to another

19  person?

20    MS. ANDERSON:  We have, the record shows, that for

21  the four plaintiffs, each of the four of them for the time

22  that they spent on an emergency scene, the maximum amount

23  of time of their on duty percentage was 3%.  They spent

24  less than 3% of their on duty time on an emergency scene.

25    And that includes the time that they spent as acting

1  battalion chief.  So that number, 3%, includes not only

2  the time that they were on the engine or on the truck, but

3  also that they were serving in the exempt capacity, as the

4  plaintiff's acknowledge, as the acting battalion chief.

5      There is no equal study as far as the amount of time

6  they spend performing management functions.  There's

7  testimony in the record that their -- the time that they

8  spend washing a truck or cleaning up took approximately

9  one hour a day, which would equal to about 4% of their

10  time.

11      So doing some rough math, assuming that they're

12  spending most of their day performing their functions that

13  they're assigned to, and responsible for doing, it would

14  show that the majority of their time is spent managing and

15  dealing with personnel issues and station issues.  And we

16  know --

17      THE COURT:  So would you say 93% of their time is

18  spent doing management duties, and then 7% is spent doing

19  front-line duties?

20      MS. ANDERSON:  I would love to agree with that

21  number.  I will tell you, math is not my forte.

22      THE COURT:  Neither is mine.  That's why I went to

23  law school.

24      MS. ANDERSON:  And we've got to add in some sleeping

25  time.  I mean, I recognize these are guides, but the

1  numbers are based on a 24-hour shift.  And we certainly

2  recognize that sleeping is part of it.  And I can't, you

3  know, divide the day up like that.

4      But I think the critical function is the amount of

5  time spent is only one of the factors in weighing the

6  primary duty, okay.  And clearly, that factor weighs in

7  favor of the County and not in favor of the plaintiffs

8  because the proposed primary duty the plaintiffs would

9  have this Court to believe, their primary duty is first

10 response work, that they spend a negligible portion of

11 their on duty time performing.

12     THE COURT:  Who supervises the captains?

13     MS. ANDERSON:  Captains report to either a battalion

14 chief or a district chief.

15     THE COURT:  All right.  And it's their -- part of

16 their duties is to enact the orders of the battalion

17 chief, correct?

18     MS. ANDERSON:  That's correct.  Except the station

19 captains aren't supervised on a daily basis by their

20 battalion chiefs or district chiefs.  They are --

21 typically, a battalion chief or a district chief would

22 take control on the fire scene.  But battalion chiefs and

23 district chiefs do not live in the station.  They leave

24 the station management duties up to the individual station

25 captain.

1    THE COURT:  So the station captain is the top guy in

2  his -- in his or her particular station?

3    MS. ANDERSON:  He is the top guy in the station.  And

4  we have a organizational chart from Station 22.  And this

5  is not an org chart that was just plucked out of the air.

6  This is an org chart that's based on Plaintiff Spencer's

7  testimony where he said that at Station 22 he is the

8  station captain.  He supervises 30 different employees

9  that are assigned to three separate shifts.  A shift, B

10  shift, and a C shift, okay?

11    The battalion chief -- there are battalion chiefs at

12  Station 22.  That's one of the stations of the 20 stations

13  in Henrico.  That's one of the stations that they live at.

14  But the station -- the battalion chiefs aren't focused on

15  the management of the station and of the station's

16  personnel.  That is the role, the central role, the

17  primary duty of the station captain.

18    THE COURT:  How does the salary of the captain

19  compare to the salary -- let's talk base salary for just a

20  second.

21    MS. ANDERSON:  Okay.

22    THE COURT:  How does the base salary of the captain

23  relay -- or how is that compared to the base salary of the

24  lieutenant, for example?

25    MS. ANDERSON:  Okay.  And you're correct to focus on

1   that, because that's what the regs require us to focus on.

2   What are -- is the salary as compared to the wage.  It's

3   not the overall annualized, what you could get with

4   overtime.  In fact, we've got case law saying you discount

5   overtime in that comparison.

6        And I don't have an exact salary number.  I have

7   grades.  As you know in government structure, you have

8   captains are paid at a Grade 33, lieutenants at a Grade

9   30, and firefighters are somewhere between a Grade 23 and

10  28, okay?

11       And that 3-grade difference is significant in

12  government work.  It's showing a significant increase of

13  salary as you go up in the promotional scale.

14       THE COURT:  All right.  Do captains have control over

15  the other employees in their station?

16       MS. ANDERSON:  Absolutely.

17       THE COURT:  All right.  Do they train employees?

18       MS. ANDERSON:  They do train employees.

19       THE COURT:  All right.  Do they direct their work?

20       MS. ANDERSON:  They do direct the work.  And

21  significantly, they direct the work -- and can I be heard

22  if I step away from -- can you hear me if I step away?

23       THE COURT:  As long as she can hear you.

24       MS. ANDERSON:  Okay.

25       THE COURT:  I can hear you.

1        MS. ANDERSON:   Okay.  Very good.

2        They not only train those that -- on a particular

3   shift, but they also ensure consistency across the

4   different shifts.  The captain is the only individual in

5   the fire station that can train A shift, B shift, and C

6   shift to a common theme.  They are not a working foreman.

7        A working foreman would be, for example, this

8   lieutenant who's on the truck, or this lieutenant who's on

9   the engine.  This lieutenant on the truck company

10  supervises these four firefighters who are assigned to the

11  truck.  And he trains them on the truck.

12       But this lieutenant here on Shift A on the -- who's

13  assigned to the truck, the ladder truck, he has no ability

14  whatsoever to train any of the firefighters on B shift, or

15  any of the firefighters on C shift.  He has no ability to

16  evaluate their performance.  He has no ability to

17  supervise them, to direct them, to assess whether or not

18  they are operationally ready to perform.

19       Only the captain who works on the D, E, F shift and

20  can work some days with the folks on A shift, other days

21  with the firefighters on B shift, and other days with the

22  firefighters on C shift, only he's positioned.

23       THE COURT:  Does the fire department engage in annual

24  or semiannual reviews of their employees?

25       MS. ANDERSON:  It does.  We have an annual formal

1  review performance evaluation.

2      THE COURT:  So once a year.  Who conducts that for

3  Fire Station Number 22?

4      MS. ANDERSON:  Fire Station 22, the firefighters that

5  are assigned to this ladder truck are reviewed by --

6      THE COURT:  When you "*this,*" is that A?

7      MS. ANDERSON:  Yes, sir.

8      THE COURT:  All right.

9      MS. ANDERSON:  Thank you.

10     On A shift, the four firefighters who are assigned to

11  the ladder truck on A shift are reviewed by the lieutenant

12  assigned to the ladder truck.  That lieutenant is

13  evaluated by the station captain.  That station captain

14  also reviews all four firefighters who are assigned to the

15  ladder truck on A shift.

16     And there's testimony in the record that -- from

17  several of the fire captains that they have the authority

18  to change those evaluations if they disagree with the

19  lieutenant, or to go back and ask questions and clarify

20  and make -- so that their performance is correctly

21  evaluated.

22     THE COURT:  After that yearly evaluation is

23  completed, is it a requirement that the station captains

24  sign that evaluation?  So in other words, your

25  firefighters are evaluated by your lieutenant, and your

1   lieutenant, I presume, signs that evaluation.  Before that

2   evaluation is final, does it have to be signed by the

3   station captain, or is it final once the lieutenant signs

4   it?

5        MS. ANDERSON:  It has to be signed.  And it's an

6   electronic process.  So there's no actual signature.

7        THE COURT:  Right.

8        MS. ANDERSON:  But it has to be approved by the

9   station captain.

10       THE COURT:  Okay.  Does the station captain handle

11  grievances and complaints?

12       MS. ANDERSON:  The -- technically, there's a 4-step

13  grievance process in the County.  And a station captain

14  would be at Step 1 if he were the direct supervisor of the

15  person grieving.  Step 2 --

16       THE COURT:  Well, the captain is the direct

17  supervisor of the lieutenant, right?

18       MS. ANDERSON:  And so therefore if a lieutenant is

19  grieving, the station captain would be the person making

20  the decision at Step 1.

21       THE COURT:  What about if the firefighter is

22  grieving?

23       MS. ANDERSON:  If a firefighter is grieving, the

24  lieutenant would go through his lieutenant for Step 1, and

25  go through the chief at Step 2.  All of the grievances go

1  through the chief at Step 2.

2       THE COURT:  So hold on a second.  And so if a

3  firefighter has a grievance, he or she takes that

4  grievance to the lieutenant, correct?

5       MS. ANDERSON:  The -- it's a 4 -- the 4-step

6  grievance process is for all localities throughout the

7  Commonwealth of Virginia.  Step 1 is with your immediate

8  supervisor.

9       THE COURT:  So for a firefighter that's --

10      MS. ANDERSON:  For a firefighter, it would be the

11 lieutenant.

12      THE COURT:  Okay.

13      MS. ANDERSON:  And Step 2 is with the head of your

14 agency.

15      THE COURT:  Okay.

16      MS. ANDERSON:  So for everybody it would be the fire

17 chief.

18      THE COURT:  Okay.

19      MS. ANDERSON:  Step 3 is the head of the County,

20 which would be our County manager.  And Step 4 would be a

21 panel.

22      THE COURT:  Okay.

23      MS. ANDERSON:  And we certainly have testimony in the

24 record that lieutenant -- that captains, fire station

25 captions, participated in the grievance process where they

1   had recommended the termination of a firefighter under

2   their command.  We have Assistant Chief Baxter saying he

3   participated in a grievance process where he recommended

4   the termination of a firefighter.  And we have Plaintiff

5   Weymouth, Captain Weymouth, where she recommended the

6   termination of a firefighter.  She was also involved in

7   the grievance process.

8        THE COURT:  Are captains involved in any way

9   regarding the discipline of employees?

10       MS. ANDERSON:  Absolutely.

11       THE COURT:  Or employees to be disciplined?

12       MS. ANDERSON:  Yes.

13       THE COURT:  All right.  And how does -- how did that

14  work?

15       MS. ANDERSON:  Captains are expected to recommend

16  discipline for those within their fire station, okay?

17  They cannot unilaterally issue or implement discipline.

18  But there's no requirement in the regs that they issue

19  discipline unilaterally.

20       In fact, the regulations clearly state that lack of

21  unilateral authority does not undermine the "*particular*

22  *weight*" notion for Factor 4 of whether or not their

23  recommendations as to discipline are given a particular

24  weight.  And that's at 29 CFR 541.105.

25       So they would make a recommendation.  It would go up

1 the chain for approval so you would have consistency

2 across the 20 fire stations.  So one guy at Fire Station 6

3 isn't getting a written reprimand, where the guy at Fire

4 Station 22 is being suspended for the same infraction.

5      And then the fire captain would be the one to --

6 often is the one to implement the discipline.

7      THE COURT:  All right.  Now, do the captains in

8 Henrico County maintain the records and statistics for

9 their particular fire station?

10      MS. ANDERSON:  Captains have a captains' office at

11 their fire station.  They -- there's information in the

12 record showing that they have control over the personnel

13 records of the individuals assigned to that fire station.

14      There's clear information in the record showing that

15 the fire captain is responsible for the budget for any

16 specialty shops or specialty teams at his fire station.

17      THE COURT:  Who provides for the safety and security

18 of the employees at the particular fire station?

19      MS. ANDERSON:  That's the job of the station captain.

20      And you have an interesting story in one of the

21 depositions from Captain Redford when one of his

22 firefighters backed an engine into the station and took

23 out a load-bearing pillar in the station.  He was called.

24 Captain Redford was not on duty that day, but he was

25 called to come to the station.

1          And why did he come to the station?  For two reasons.

2    To make sure that that station continue -- could continue

3    to meet the needs of its citizens and dispatch calls, and

4    also to make sure of the safety of the firefighters

5    assigned to that station, given that the station had had a

6    construction problem.

7          THE COURT:  What about any kind of legal compliance?

8    Whose responsibility is that for the particular stations?

9          MS. ANDERSON:  Certainly, a station captain.  One of

10   the lists of the examples of work that they are supposed

11   to make sure that the rules and regulations of the Fire

12   Division of the County of Henrico are made available to

13   the -- the personnel assigned to that station.  They're

14   also in charge of making sure that any infractions, people

15   who violate those rules, that those rules -- that those

16   individuals are investigated and appropriately

17   disciplined.

18         THE COURT:  Okay.  What control do chiefs have over

19   the captains?

20         MS. ANDERSON:  I mean, certainly chiefs in a

21   hierarchical structure are above the captains.

22         THE COURT:  So you agree with the plaintiff that the

23   firehouse is -- this is where I'm going with this.  You

24   agree with him that it's a command structure?

25         MS. ANDERSON:  It is a command structure.  And at the

1  firehouse, though, the captain is at the top of that

2  command structure.

3      THE COURT:  Okay.  So when a captain assigns himself

4  to a fire engine, for lack of a better term, that he has a

5  responsibility to be part of the team and go out and fight

6  fires so they have the proper number of people, would you

7  categorize the captains' duties -- as having mixed duties,

8  both managerial and nonmanagerial?

9      MS. ANDERSON:  I would.  I would say that -- and I

10 think that there's evidence in the record that for the

11 overwhelming majority of the time, the captain sits in

12 command of that apparatus that departs.

13     If you take a look at the McDowell -- the second

14 affidavit that -- by Chief McDowell, Exhibit A, which

15 shows the number of times the unit was dispatched and

16 where the captain rode, and if the captain rode -- rides

17 in the officer in charge position, he's in charge of that

18 unit.  So, yes.

19     When he's on scene, he's in charge of that fire

20 scene, he's in charge of the unit, in charge of the

21 personnel.  He's supervising them.  There is a management

22 role there.

23     What I want to be careful to state though is that the

24 County's classification of the fire captain is not based

25 on the management role he performs on emergency scenes.

1  And that is what makes the First Responder Regulation

2  irrelevant to the Court's analysis because the County

3  premises its classification of the fire station captain

4  for his management role at the station.  Ensuring the

5  operational preparedness of the station, and ensuring a

6  consistency across the different shifts.

7      THE COURT:  So let's say if your captain does not

8  assign himself -- first of all, are there any captains in

9  Henrico County who do not assign themselves to a unit such

10  that they're not part of the number of individuals who go

11  out on the scene to an emergency?

12      MS. ANDERSON:  I want to be clear.  There are 20 fire

13  stations, and in this litigation we're talking about the

14  station captains.  We do have other captains in purely

15  administrative roles who are not -- and do not typically

16  respond.  There's no -- there's no engine unit assigned to

17  the training facility, for example.

18      THE COURT:  Very good.  So for a captain who does not

19  assign themself to an engine to respond to an emergency,

20  would you classify that captain's duties as mixed, or

21  would you classify that captain's duties as purely

22  managerial?

23      MS. ANDERSON:  Okay.  I would classify the fire

24  station captains' duties - I want to be clear - as mixed

25  only when they are on the fire scene, okay?  I do not

1  classify their duties as mixed when they are in the

2  station house.

3       THE COURT:  But what if they volunteer to cut the

4  grass?  Or certainly cutting the grass isn't a managerial

5  duty, right?

6       MS. ANDERSON:  Absolutely.  It's not a managerial

7  duty.

8       THE COURT:  Certainly washing the fire engine is not

9  a managerial duty?

10       MS. ANDERSON:  Absolutely not.  And nor is it a duty.

11       THE COURT:  All right.

12       MS. ANDERSON:  It is something that they elect to

13  spend their day.  And they choose to do that for a

14  management purpose to implicate a sense of comradery to

15  show that they're no better than the rest of the team.

16       To lead by example, which, as Mr. Butler pointed out

17  under the FLSA, the *Family Dollar* case in the Fourth

18  Circuit, executives can multitask.  It's a concurrent

19  duty.  And when they choose to multitask by spending some

20  of their time on nonexempt duties, that's apparently a

21  part of being management.

22       THE COURT:  When you make the argument -- you're

23  obviously making the argument that the station captains'

24  duties are management in nature.  Are you making that

25  argument based off of the job descriptions that you kind

1  of cited in Exhibit 2A, and B, and C, and all that?  Are

2  you making that argument based -- from a practical

3  standpoint of what the station captains actually do?

4       MS. ANDERSON:  The latter.  A practical standpoint.

5       Mr. Butler's correct.  If our job descriptions had no

6  basis in reality, I would be on very thin ice.  But all of

7  the plaintiffs acknowledge that those jobs listed in their

8  job descriptions were jobs that they were responsible for.

9  And we heard testimony from each of the plaintiffs that

10  they actually performed, or they delegate the performing

11  of those jobs, which is another inherently executive

12  function.

13       So -- and we had a lot of testimony from former

14  captains that talked about their management role with

15  respect to the station, its construction, its -- and its

16  supervision of its personnel.

17       THE COURT:  All right.  With respect to personnel, do

18  station captains have any input on hiring and firing?

19       Let's separate those for a second.  So, does the

20  station captain have any input on hiring?

21       MS. ANDERSON:  The hiring process is not one that a

22  station captain would normally be involved in.  They could

23  sit on a hiring committee or a hiring panel, but typically

24  that's a -- an academy that's brought through in a very

25  different type of process.

```
1          THE COURT:  All right.  Do they have any input on
2    firing?
3          MS. ANDERSON:  Absolutely.
4          THE COURT:  Do they have the unilateral ability to
5    fire anyone under their command?
6          MS. ANDERSON:  No.  There's only one person in the
7    fire department that can do that, and that's the chief.
8          THE COURT:  All right.  Okay.
9          You've answered some of my questions so I don't want
10   to repeat that.
11         I'm going to ask you the same question I asked
12   Mr. Butler.
13         And I'm sorry.  I kept calling you Mr. Harris.
14         MR. BUTLER:  It happens all the time.
15         THE COURT:  I know you as Harris, but I kept calling
16   you Mr. Harris.  Mr. Butler.
17         Would you consider the captain's job a blue-collar
18   job or a white-collar job?
19         MS. ANDERSON:  In those terms, the captains serve --
20   a white-collar job.
21         THE COURT:  Why?
22         MS. ANDERSON:  He serves as an executive.  He is the
23   head of his station.  He is the main manager.  He is a
24   manager of the station and its personnel.
25         THE COURT:  Okay.  So I'm going to give you the same
```

1  example that I gave Mr. Butler, but with a little bit of a

2  different twist.  So, again, in a former life I was a

3  manager at the U.S. Attorney's Office.  And I carried a

4  full caseload while I was a manager, but I didn't have the

5  ability to fire anyone, I didn't have the ability to

6  unilaterally discipline anyone, I didn't have the ability

7  to send someone home unilaterally if they, you know, made

8  some kind of mistake.  Like put them on leave without pay.

9       I didn't have -- so was I a manager, or was I a

10  front-line worker?

11       MS. ANDERSON:  You were absolutely a manager.

12  There's no requirement under Factor 4 of the executive

13  exemption that the individual manager have to have

14  unilateral authority to hire, fire, promote, demote.  It

15  simply must be that he has, as a job duty, -- gives

16  suggestions and recommendations.  And those suggestions

17  and recommendations don't always have to be heard and

18  agreed with by his superiors, okay?  They just must be

19  given particular weight.

20       And here the record is replete with instances of when

21  there have been terminations, fire captains have been the

22  ones recommending the termination, and the chief has given

23  those recommendations significant weight.

24       Same with promotions.  Plaintiff Weymouth sat on four

25  different promotional panels.  The fire chief met with

1  her, and the other panel members on each of them.   Her top

2  three candidates were promoted in each instance.

3      There's also plenty of testimony about how the fire

4  captain -- the fire chief calls the fire captaus.  Not a

5  lieutenant, a fire captain, about promotions within his

6  station, and has given those recommendations significant

7  weight.  And that's the controlling test:  Whether or not

8  the recommendations are given particular weight.

9      THE COURT:  All right.  So tell me anything else that

10  you would like to tell me that I haven't covered with my

11  questions that makes it such that I should rule in your

12  favor.

13      MS. ANDERSON:  Okay.  I'd like to respond, if I

14  might, to one of Mr. Butler's arguments which was talking

15  about preparedness in that the -- he left the Court with

16  the notion that station captains, to the extent that he

17  ensures preparedness of his men, that that equals first

18  response duties.  And that is a notion that is not

19  contained in the record or in the regulations.

20      In fact, the preamble makes a very clear division

21  between what are first response duties and what are

22  executive duties within the fire division.  And one of the

23  things that the preamble notes is that it lists expressed

24  duties that would constitute executive management

25  functions, and would qualify a fire suppression employee

1   as a high level executive.  And some of those include

2   coordinating and implementing training, ensuring

3   operational readiness through supervision, inspection of

4   personnel and inspection of equipment.

5       And that's precisely what Henrico fire captains do.

6   Unlike many of the other localities where the fire captain

7   sits on a particular unit and sits instead of a lieutenant

8   and serves as a working foreman, the Henrico fire captain

9   sits instead as the station captain.  He is not embedded

10  with a particular unit, but instead works across all of

11  the units and therefore meets the expressed duties that

12  are listed in the preamble that would make him an

13  executive.

14      THE COURT:  All right.

15      MS. ANDERSON:  As to the issue of damages, I'll just

16  make note, I think the record is very clear about the

17  County's good faith efforts that it took before 2004 when

18  the regulation was implemented, and then thereafter after

19  the implementation in August of 2004.  This was not a

20  decision made in haste.  It was a decision made based on

21  the controlling case law at the time.

22      And that controlling case law has not fundamentally

23  changed here in the Fourth Circuit.  You still have -- you

24  the *Morrison* decision from last fall, and you have

25  decisions in other circuits that if the decision were

1   being looked at today, the County Attorney's Office would

2   very likely make the very same opinion, render the same

3   opinion, because, I would submit to the Court, that we got

4   it right back in 2004.

5        And so the County relied in good faith on its County

6   Attorney's opinion, and so therefore the Court should

7   exercise -- shouldn't get to the issue of damages,

8   exercises its discretion and not award liquidated damages.

9   And certainly the plaintiffs have made no showing of

10  willfulness.

11       THE COURT:  All right.

12       MS. ANDERSON:  Thank you.

13       THE COURT:  Thank you very much.

14       So, Mr. Butler, I want you to respond just to two

15  things.  So this won't be a wholesale response.

16       MR. BUTLER:  Yes, sir.

17       THE COURT:  I gave each of you an opportunity to

18  answer my questions and to get everything out, but there's

19  two things I want to hear from you about.

20       First, I want to hear about your -- do you have any

21  response to her argument that the lieutenant is actually

22  the working foreman and not the station captain?

23       MR. BUTLER:  Yes, sir.  This goes to the notion that

24  the first tier supervisor, the lieutenant, is the working

25  foreman but not the second tier supervisor.  Their

1  argument would work if the fire captain did not roll with

2  that engine every time it leaves the station when they're

3  on duty.  And that's the testimony.  That when the engine

4  leaves -- and it's because of minimum staffing.

5       They don't have the luxury of having a captain that

6  sits, as this work chart would have you believe, back at

7  the station, and dispenses and elects when he goes and

8  when he doesn't.  I mean, they have to go.  And they do

9  go.  And the record should be clear on that that they're

10 always on the unit.

11      The County's position is that because of the second

12 supervisor, the second tier supervisor, that by

13 definition, by organizational chart definition, they

14 cannot be a working foreman.  That belies the facts.  They

15 ignore the hands-on duty, as they ignore the application

16 of the First Responder Regulation.

17      I don't know how they got to this point, but to argue

18 to this Court that Henrico can ignore the First Responder

19 Regulation because it doesn't matter because they say,

20 under their organizational chart, that the captain is not

21 a working foreman ignores the facts and I think goes to

22 their financial motivation to misclassify these captains

23 over a period of 10 years.

24      So, you know, the captains very clearly do the job.

25 And the Department of Labor looks at the function you're

1   doing.  And they're in the First Responder Regulation.

2   How you can address this case without looking at that, I

3   don't know.

4        THE COURT:  Okay.  The second thing I want you to

5   respond to is you didn't discuss liquid damages.

6        MR. BUTLER:  Liquidated damages.  Right.

7        THE COURT:  And she did, so I just wanted to give you

8   a chance to respond on that since you haven't raised that

9   issue.

10       MR. BUTLER:  Certainly.  So, the rule under the Fair

11  Labor Standards Act is that liquidated damages are

12  presumed.  In other words, the Fair Labor Standards Act

13  doesn't allow for emotional distress recovery or punitive

14  damages.  They allow for if you're not paid in the pay

15  period due because, you know, the law is set up to

16  compensate workers who are entitled to overtime their

17  overtime, and if an employer does not pay it in the pay

18  period due and award liquidated damages, or doubling of

19  the 2-year damages, which is the standard to reach back

20  limitations period, is presumed.  And for them to overcome

21  that, there's two types of good faith.  Section 11 and

22  Section 12.

23       And the Act allows good faith where the Department of

24  Labor has come in and said, you know, here, in your

25  circumstance, this is permitted and you're doing it okay.

1   If they rely on a D.O.L. opinion, if they rely on some
2   statement of the Department of Labor, that constitutes
3   good faith.  It's not this kind of touchy-feely that we
4   felt like we were doing it okay and we got it wrong.  I
5   mean, that's not what good faith -- to overcome the
6   presumed liquidated damages.
7        Now, if we go to willful and -- and to avoid
8   liquidated damages, good faith is their burden.  I mean,
9   they have to prove good faith.  In other words, they -- we
10  get liquidated damages unless they meet their burden on
11  good faith.
12       For willfulness, there's a third year that applies if
13  we can show willful violation.  And that, of course, can
14  be liquidated or doubled as well.  That's where we get
15  into this argument that they had no factual basis based on
16  the duties of what these captains did.  And they still to
17  this day really don't recognize, even in court, that the
18  captains are on the engines and are doing the first
19  responder duties.
20       Their position is that they found a way to finesse to
21  get around having to apply the First Responder Regulation
22  that virtually every other jurisdiction across the
23  country -- I mean, many many jurisdictions.  Most
24  jurisdictions in Virginia.  But many many jurisdictions
25  have accepted this.

1    And how Virginia -- how Henrico's fire captains are

2  different, how they operate in any other fire station in

3  the country, is a mystery.  Every station has multiple

4  levels.  You know, they're going to have lieutenants and

5  captains.

6    I mean, this is a pretty typical -- we handled a case

7  not too long ago in Portsmouth against the City of

8  Portsmouth who also didn't pay their fire captains

9  overtime.  They resolved the case after -- after

10  discovery.

11    But the fact is that they relied on the same second

12  tier supervisor that the captain was not a working

13  foreman.  The HR person in Portsmouth claimed to not even

14  know that the captains were riding on the engines.

15  Henrico knows.  They just put their head in the sand

16  ostrich-like.  I mean, they try to ignore it.

17    They really want to look at here's our job

18  description, here's what we would like, here's the

19  ultimate responsibilities of the captains.  And we don't

20  deny anything.  The captain has some responsibility for

21  these roles.

22    But that does not outweigh their primary function,

23  which is to get on that engine and respond to, what the

24  County would say, the first matter of urgency.  But it's

25  their primary duty.  It's why they're there.  It's why

1   they're there 24/7.  It's why they're on those trucks.

2   That's their primary duty.

3        THE COURT:  Okay.

4        MR. BUTLER:  And I think preparedness can't be

5   divorced from that.

6        THE COURT:  Thank you.

7        MR. BUTLER:  Thank you.

8        THE COURT:  One second.

9        Okay.  Very good.

10       So I presume both of you want the transcript, is that

11   right, or you don't?

12       MR. BUTLER:  Your Honor, I mean, it -- not until we,

13   I guess, know which way this is going.  I mean, we will

14   need a transcript.

15       I suppose in order to review for the -- for Judge

16   Payne for the review and recommendation, that --

17       THE COURT:  Do you want it or not?

18       MR. BUTLER:  I don't think we need it at this point

19   from the plaintiffs.

20       MS. ANDERSON:  The County will take a copy of the

21   transcript.

22       THE COURT:  Okay.  Very good.  If you will get with

23   the court reporter after we're adjourned.

24       So we will -- I will review all of this and have

25   something out shortly.

1        MR. BUTLER:  Thank you, Your Honor.

2        THE COURT:  And shortly is relative.

3        Anything else from the plaintiff?

4        Anything else from the defense?

5        MS. ANDERSON:  Thank you, Your Honor.

6        THE COURT:  All right.  Very good.

7            (The proceeding concluded at 3:00 p.m.)

8

9                    REPORTER'S CERTIFICATE

10          I, Krista Liscio Harding, OCR, RMR,
   Notary Public in and for the Commonwealth of
11  Virginia at large, and whose commission expires
   March 31, 2016, Notary Registration Number 149462,
12  do hereby certify that the pages contained herein
   accurately reflect the notes taken by me, to the
13  best of my ability, in the above-styled action.
          Given under my hand this 27th day of July, 2015.

14

15                    _____
                    Krista Liscio Harding, RMR
16                    Official Court Reporter

17

18

19

20

21

22

23

24

25