IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

DEBORAH WEYMOUTH, *et al.*, )
*On behalf of themselves and others* )
*similarly situated* )
    Plaintiffs, )
     )
    v. )     Civil Action No. 3:14CV419 (REP-RCY)
     )
COUNTY OF HENRICO, VIRGINIA )
    Defendant. )
_____ )

## REPORT AND RECOMMENDATION
### On Cross Motions for Summary Judgment

This matter is before the Court pursuant to 28 U.S.C. § 636(b)(1)(B) for Report and

Recommendation on the Parties' cross motions for summary judgment (ECF Nos. 20, 22).

Plaintiffs Deborah Weymouth, James Redford, James A. Hughes, and Larry W. Spencer

("Plaintiffs") all are or were Captains employed by the County of Henrico, Virginia ("Defendant")

in the Henrico County Division of Fire ("HFD"). Plaintiffs bring this collective action suit on

behalf of themselves and a class of similarly situated individuals, alleging that Defendant violated

the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA") by improperly classifying

Plaintiffs as employees exempt from the FLSA's overtime compensation requirement. (Collective

Action Compl. ("Compl.") at 9-12, ECF No. 1.)[1]

At issue in this case is whether Defendant's classification of Captains is proper and,

therefore, whether Plaintiffs, under the FLSA are entitled to back pay for unpaid overtime wages.

Defendant argues that it has properly classified Captains as executives who are exempt from the

FLSA's overtime compensation requirements. (Mem. Supp. Def.'s Mot. Summ. J. ("Def.'s Mem.

---

[1] For all citations to the Parties' Briefs, Motions, and Memoranda, the Court uses those documents'
internal pagination, not the pagination generated by the ECF system.

Supp.") at 1, 16-26, ECF No. 21.) Defendant also argues that, assuming it has improperly classified Captains as exempt from overtime, Plaintiffs' damages should be limited to two years and that Plaintiffs should not receive liquidated damages. (Def.'s Mem. Supp. at 26-30.)

Plaintiffs argue that Defendant has improperly classified Captains as Exempt Executives and, therefore, that Plaintiffs are entitled to back pay. (Pls.' Mem. Supp. Mot. Summ. J. ("Pls.' Mem. Supp.") at 1-2, 16-23, ECF No. 23; Oral Argument Tr. ("Tr.") 3:16-18, ECF No. 33.) Plaintiffs also argue that the First Responder Regulation, 29 C.F.R. § 541.3, must inform the Court's analysis of Captains' exemption status. (*See* Tr. 11:6-16.) The Parties have filed cross motions for summary judgment, on which the Court heard oral argument on July 14, 2015. The Parties' motions are ripe and ready for review.

Having considered the Parties' motions, briefs, and oral argument, and for the reasons discussed below, the Court finds that there are no genuine disputes as to any material facts, that Defendant has demonstrated with clear and convincing evidence that it has properly classified Captains as Exempt Executive employees, that Defendant did not willfully violate the FLSA, and that Defendant classified Captains as Exempt Executive employees in good faith. Therefore, the Court ultimately finds that summary judgment should be entered in favor of Defendant.

Accordingly, the Court RECOMMENDS that Plaintiffs' Motion for Summary Judgment (ECF No. 22) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 20) be GRANTED IN PART as to the issue of Defendant's alleged violation of the FLSA's Overtime Requirement, that Defendant's Motion for Summary Judgment (ECF No. 20) be DENIED IN PART AS MOOT as to the issues of the recovery period and liquidated damages, and that JUDGMENT be ENTERED in favor of Defendant.

In the alternative, the Court RECOMMENDS that Summary Judgment be GRANTED in favor of Defendant as to Plaintiffs' willfulness claim, thereby limiting any recovery to two years,

and further RECOMMENDS that Summary Judgment be GRANTED in favor of Defendant as to the issue of liquidated damages, thereby barring Plaintiffs from receiving liquidated damages in this action.

## I. BACKGROUND

Plaintiffs argue that they are entitled to overtime wages because their primary duty is to fight fires (i.e., their primary duty is not managerial), they perform essentially the same functions as "Non-Exempt" Lieutenants, the First Responder Regulation applies to Plaintiffs, and the Defendant cannot show by clear and convincing evidence that Plaintiffs are properly classified as Exempt Executives under the FLSA. (Pls.' Mem. Supp. at 1-2, 16-23; Tr. 3:16-18, ECF No. 33.)

Defendant argues that Plaintiffs are not entitled to overtime wages because Plaintiffs' primary duty is management of the fire station, Plaintiffs meet the requirements to be considered "Exempt Executives" without consideration of their role in the conduct of fighting fires, and the First Responder Regulation does not replace the "Primary Duty Test." (Def.'s Mem. Supp. at 1, 16-26; Tr. 28:6-9.) Thus, Defendant argues, Plaintiffs have been properly classified as Exempt Executives under the FLSA. (Def.'s Mem. Supp. at 16.) Defendant further argues that it has acted in good faith in its classification of Plaintiffs and did not willfully violate the FLSA and, therefore, that Plaintiffs should not be entitled to liquidated damages. (Def.'s Mem. Supp. at 26-30.)

Before presenting the material facts in this case, the Court notes that Plaintiffs have alleged that there is a genuine dispute of material facts. (*See* Pls.' Resp. Opp'n Def.'s Mot. Summ. J. ("Pls.' Resp.") at 3-8, ECF No. 24.) While Plaintiffs have provided a list of disputed facts in their Response to Defendant's Motion for Summary Judgment, (Pls.' Resp. at 3-8), as required by Local Civil Rule 56(b), Defendant provides no such listing of disputed facts in its Response to Plaintiffs' Motion for Summary Judgment (*see* Def.'s Mem. Opp'n to Pls.' Mot. Summ. J. ("Def.'s Resp.") at 2-11, ECF No. 26). Rather, Defendant alleges that Plaintiffs' listing of undisputed facts in their

Motion for Summary Judgment "contain omissions of fact, misstatements of the record, or unsupported opinions." (Def.'s Resp. at 2.) Indeed, Defendant has consistently maintained that the material facts in this action are not genuinely in dispute. (*See* at Def.'s Mem. Supp. at 6-15; Def.'s Resp. at 2-3; *see also* Def.'s Reply Mem. Supp. Mot. Summ. J. ("Def.'s Reply") at 5, ECF No. 27.) Rather, Defendant argues that "an intellectually rigorous review of the material facts . . . reveals that Plaintiffs' true primary duty is management of the station and its personnel." (Def.'s Resp. at 1-2.)

Having carefully reviewed the record, the Court finds that the following are undisputed facts that are material to the outcome of this case. In the instances where one of these facts has been challenged as disputed, the Court provides its reasoning for determining that the relevant material fact is actually undisputed. Having reviewed the facts, the Court finds that there are no genuine disputes as to any material facts. The parties vigorously dispute the legal conclusions drawn from the facts; however, the underlying facts themselves are not in dispute.

## A. Organizational Structure of Henrico County Division of Fire

1. Plaintiffs were employed by Defendant as Fire Captains ("Captains") within the three-year period prior to the filing of this action. (*See* Def.'s Resps. to Pls.' First Interrogs. & Reqs. for Prod. of Docs. ¶ 7, ECF No. 23-2.)[2]

2. Defendant operates twenty fire stations, each of which has a single Captain. (Affidavit of Anthony E. McDowell ("McDowell Aff.") ¶ 5, ECF No. 21-1; Dep. of James A. Hughes ("Hughes Dep.") 34:7-12, ECF No. 21-10.)

---

[2] For all citations to exhibits in the record, the Court uses those documents' internal pagination, not the pagination generated by the ECF system. Because various portions of the same exhibits have been filed multiple times under various ECF numbers, the Court will also provide a citation to a specific ECF document number for ease of reference to the specific pin cite in the exhibit.

3.  Stations are staffed by Firefighters, Lieutenants, and Captains. (McDowell Aff. ¶ 6, ECF No. 21-1; *see* Hughes Dep. 13:1-15:16, ECF No. 21-10; Dep. of Deborah Weymouth ("Weymouth Dep.") 16:2-16:25, ECF No. 23-3.)

4.  Some stations are also staffed by "specialty shops." (McDowell Aff. ¶¶ 7-8, ECF No. 21-1.)

5.  Firefighters and Lieutenants are assigned to one of three shifts, designated as A, B, and C. (McDowell Aff. ¶ 6, ECF No. 21-1.)

6.  Captains are assigned to one of three shifts, designated as D, E, and F. (McDowell Aff. ¶¶ 6, 23, ECF No. 21-1.) Captains work a different shift schedule than their subordinates, enabling them "to work with, evaluate, and supervise each of the shifts at [their] station[s] on a rotating basis each month." (McDowell Aff. ¶ 23, ECF No. 21-1.)[3]

7.  "Fire Captains are responsible for apportioning the work among the three shifts." (McDowell Aff. ¶ 15, ECF No. 21-1; *see* Weymouth Dep. 23:7-24, ECF No. 24-2.)[4]

---

[3] As discussed below, Plaintiffs dispute the role of Captains in evaluating and supervising their shifts. The Court, however, finds that there are not any genuine disputes as to any material fact regarding Captains' role in supervision and evaluation. *See infra* Fact ¶¶ 7, 48, 50, 60, 63, 68, 69, 71 & Footnotes 4, 11, 13, 20, 22, 23, 24.

[4] Plaintiffs dispute Fact ¶ 7. (Pls.' Resp., Listing of Disputed Facts ("Pls.' LDF") ¶ 11, ECF No. 24.) However, Plaintiffs in fact have conceded that "Captains are responsible for apportionment of duties." (Pls.' LDF ¶ 11.) Plaintiffs' primary contention seems to be that Captains do not *regularly* apportion work, but rather that apportionment is "either predetermined or delegated by Captains to the Lieutenants," who also ensure that such work is completed. (Pls.' LDF ¶ 11.) Having reviewed the record, however, the Court finds that Fact ¶ 7 is not genuinely in dispute. The portions of the Hughes Deposition cited by Plaintiffs do not render this fact in dispute.

First, these indicate that apportionment of daily work has been standard for some time, but that a Captain is the individual who is responsible for amending that apportionment. (Hughes Dep. 163:8-15, ECF No. 24-1.) Second, they indicate that Lieutenants have the authority to make a *temporary* change in the work schedule if their particular shift is busy that day, but that only Captains can make work changes on an "ongoing basis." (Hughes Dep. 184:12-185:16, ECF No. 24-1 (emphasis added).)

Likewise, the portions of the Weymouth Deposition cited by Plaintiffs do not bring this fact into dispute. First, those portions indicate that Lieutenants coordinate the functions on their particular shifts, but that Captains oversee all three station shifts and delegate the work among the three

8. According to Henrico County's "Class Specification" for Fire Captains, a Captain "directs the activities of an assigned station in accordance with rules and regulations and Division policy" and "coordinat[es] the functions of all three shifts." (Affidavit of Paula G. Reid ("Reid Aff."), ECF No. 21-2, Ex. 2-A, ECF No. 21-3.)

9. Plaintiffs have testified that, as Captains, they performed most of the job duties listed in the Class Specification. (Weymouth Dep. 42:13-16, ECF No. 21-9; Hughes Dep. 35:2-20, ECF No. 21-10; Dep. of James A. Redford ("Redford Dep.") 17:12-50:16, ECF No. 21-11; Dep. of Larry W. Spencer ("Spencer Dep.") 20:5-73:19, ECF No. 21-12 (discussing responsibilities in the Class Specification, line-by-line, and agreeing that Captains "direct[] the activities of an assigned station in accordance with rules and regulations and Division policy").)

10. The chain of command for HFD is as follows: Firefighters report to Lieutenants; Lieutenants report to Captains; Captains report to either a Battalion Chief or a District Chief. (Hughes Dep. 14:23-15:10, ECF No. 21-10; *see also* Weymouth Dep. 16:10-22, ECF No. 21-9.)

---

shifts. (Weymouth Dep. 23:7-24, ECF No. 24-2.) Second, they indicate that "lieutenants make the decision *amongst their shift* as to who does the preplans," but that Captains "reallocate the work among the shifts" in order to divide work "evenly among the shifts." (Weymouth Dep. 82:1-19, ECF No. 24-2 (emphasis added).)

Moreover, the Redford deposition does not bring this fact into dispute. In fact, the portions of the Redford deposition cited by Plaintiffs indicate that a Captain may delegate apportioning work to Lieutenants, but that the Captain retains ultimate authority to apportion work when Lieutenants "weren't able to resolve it amongst themselves." (Redford Dep. 63:3-22, ECF No. 24-3.) Finally, the Spencer deposition merely stands for the proposition that a Captain may "inherit" the division of labor among the three station shifts, but that a Captain also has the authority to change that division. (Spencer Dep. 112:1-23, ECF No. 21-12.)

Having reviewed the record, the Court finds that Fact ¶ 7 is not genuinely in dispute. Captains indisputably have the final responsibility for apportioning work among their stations' shifts. Some of the work may be "predetermined" or "inherited," and Captains may choose to delegate some apportionment to their Lieutenants; however, as Redford's testimony indicates, Captains retain the final authority to apportion work in the event that Lieutenants are unable to "resolve it amongst themselves." (Redford Dep. 63:3-22, ECF No. 24-3.)

11. The head of the HFD is the Fire Chief.  The current Fire Chief is Anthony E. McDowell, who has served in that capacity since October 20, 2012.  (McDowell Aff. ¶¶ 1-2, ECF No. 21-1; *see also* Hughes Dep. 40:7-8, ECF No. 23-1.)

**B. Daily Activity at Fire Stations**

12. There are certain tasks, known as "Daily Checks," that everyone at a given station must attend to on certain days of the week.  Daily Checks include self-inspections of an individual's breathing apparatus and inspections of the fire engine and trucks.  (Dep. of Andrew M. Baxter ("Baxter Dep.") 51:15-52:15, ECF No. 21-13; Dep. of Donnie Deaver ("Deaver Dep.") 31:4-24, ECF No. 23-5.)

13. Captains conduct Daily Checks of their personal and their particular station's apparatus and equipment.  (*See, e.g.*, Baxter Dep. 52:3-15, ECF No. 21-13; Redford Dep. 43:19-44:5, ECF No. 24-3.)

14. "Captains are ultimately responsible for the maintenance of their respective stations and station apparatus."  Although a Captain may delegate day-to-day responsibility to Lieutenants and Firefighters, the "Captain retains ultimate responsibility for ensuring that the station and apparatus are operationally ready and is further charged with handling larger maintenance and logistical issues that may arise."  (McDowell Aff. ¶ 13, ECF No. 21-1; *see* Weymouth Dep. 25:8-15, ECF No. 21-9; Redford Dep. 21:18-23, ECF No. 21-11; Hughes Dep. 182:10-20, ECF No. 21-10; Spencer Dep. 24:8-19, ECF No. 21-12; Baxter Dep. 49:21-50:12, ECF No. 21-13.)[5]

15. There are other station duties beyond the Daily Check.  These duties are referred to as "Daily Duties" or "Dailies" and can be considered akin to housework.  Housework includes:

---

[5] Plaintiffs do not dispute the facts in Fact ¶ 11, (*compare* Pls.' Resp. at 3-8, *with* Def.'s Mem. Supp. at 1-15); therefore, the Court deems the facts to be admitted.  *See* Fed. R. Civ. P. 56(e)(2); Local Civil Rule 56(b).  In this Report and Recommendation, the Court generally refrains from specifically highlighting facts that Plaintiffs do not dispute.  In the instances wherein the Court considers it useful to do so, the Court will highlight facts that Plaintiffs do not dispute.

maintenance issues; sweeping and mopping; cleaning the bathrooms, offices, day rooms, and kitchen; and, "generally making sure the station is squared away after the previous 24-hour shift." (Baxter Dep. 51:7-53:12, ECF No. 21-13.)

16. Some housework, such as cleaning the bathrooms, is generally "reserved just for the rookies," although a Captain can also perform that work. (*See* Baxter Dep. 54:5-55:4, ECF No. 21-13.)

17. "Captains are not required to perform manual jobs around the station," and they have discretion as to whether or not to engage in "daily apparatus and station cleaning and maintenance duties." While engaging in such duties, "Captains are not relieved of their supervisory or command duties." (McDowell Aff. ¶ 30, ECF No. 21-1.)[6]

---

[6] Plaintiffs essentially dispute the role of Captains in performing Non-Exempt work. (*See* Pls.' LDF ¶ 40.) Plaintiffs argue that they spend a majority of their time on Non-Exempt work and that "Captains are expected to perform these tasks." (Pls.' LDF ¶ 40.) Plaintiffs also cite an instance wherein a Captain was ordered to clean dirty equipment. (Pls.' LDF ¶ 40.)

The Hughes, Redford, Spencer, Baxter, and McDowell depositions confirm that Captains work alongside their subordinates in performing Non-Exempt work. (Hughes Dep. 232:22-233:10, ECF No. 24-1; Redford Dep. 43:22-44:5, ECF No. 24-3; Spencer Dep. 41:20-42:16, ECF No. 24-4; Baxter Dep. 52:23-55:4, ECF No. 24-6; McDowell Dep. 114:23-115:13, ECF No. 24-7.) Furthermore, the Hughes deposition indicates that Captains spend only a few days a year performing evaluations or issuing "written coaching and/or counseling." (Hughes Dep. 231:18-232:21, ECF NO. 24-1; *see also* Spencer Dep. 42:3-5, ECF No. 24-4.) However, the Hughes deposition does not unequivocally stand for the proposition that Captains are expected to perform Non-Exempt work. Hughes did testify that "it's everybody's responsibility . . . to accomplish what the daily activities are, whether equipment checking out and the responding to calls." (Hughes Dep. 235:8-11, ECF No. 24-1.) However, Hughes never testified that he was *required* to perform Non-Exempt work; rather, his testimony indicates that he performs such work, whether it is mandatory or not, in order "to chip in," to be a good example, and to show that all personnel are on the same team. (Hughes Dep. 235:19-236:23, ECF No. 24-1.) Spencer, Redford, Baxter, and McDowell testified similarly. (*See* Spencer Dep. 41:1-22, ECF No. 24-4; Redford Dep. 48:9-20, ECF No. 24-3 (in the absence of a direct order from a superior, a Captain only cleans the station as a "voluntary choice"); Baxter Dep. 53:13-54:4, ECF No. 24-6 ("[I]t's a balance between trying to lead by example and letting people do their jobs against and with all the other responsibilities of being a station captain"); McDowell Dep. 115:2-6, ECF No. 24-7 ("[M]y leadership style was to be involved in the manual work").) Finally, the fact that Captains are "evaluated on the overall function of their station, including its maintenance and appearance," (Pls.' LDF ¶ 40 (citing Hughes Dep. 235:3-4, ECF No. 24-1)), reinforces McDowell's testimony that "Captains are ultimately responsible for the maintenance of their respective stations and station apparatus" (McDowell Aff. ¶ 13, ECF No. 21-1).

18. A Captain's involvement in the housework "depend[s] entirely on the day." The range of involvement is "from one end of the spectrum, no involvement at all, to the other end of the spectrum, to participating in all of the other activities." (*See, e.g.*, Baxter Dep. 53:13-19, ECF No. 24-6.)

19. Because of their "unique role," Captains may choose to engage in housework in order to "lead by example," (Baxter Dep. 53:25-54:4; 100:20-25, ECF No. 21-13), to "[j]ust help out," (Spencer Dep. 40:17-42:24, ECF No. 21-12), to "set[] an example to the people that were assigned to [them]," (Redford Dep. 76:15-24, ECF No. 21-11), or to show all station personnel that they are "all on the same team" (Hughes Dep. 234:9-237:4, ECF No. 21-10).

## C. Emergency Calls and Other "Field" Activities

### 1. Emergency Calls

20. When an emergency call has been placed, a minimum staffing requirement holds that a minimum number of individuals must staff the responding fire engine. The minimum staffing requirement for a fire engine is three individuals. (Weymouth Dep. 19:3-11, ECF No. 21-9; Deaver Dep. 41:19-21, ECF No. 24-5.)

21. Firefighters, Lieutenants, and Captains are all part of the minimum staffing for fire engines. (Deaver Dep. 41:19-42:2, ECF No. 24-5.)

---

The Redford deposition confirms that Captains can be ordered by a superior to clean dirty equipment. (Redford Dep. 48:9-23, ECF No. 24-3.) However, Redford did qualify his testimony by stating that he only received such an order when he was the only individual at the station available to perform the work. (*See* Redford Dep. 44:6-23; 48:9-23, ECF No. 24-3.)

In short, the portions of the record cited by Plaintiffs do not contest the fact that Captains are "not required to perform manual jobs around the station." (McDowell Aff. ¶ 30, ECF No. 21-1.) Rather, those portions support the undisputed proposition that Captains often perform manual work alongside their subordinates and that Captains do so, in large part, to improve morale and "chip in." Accordingly, the Court finds that Fact ¶ 17 is not genuinely in dispute.

22. The minimum staffing for fire engines does not include District Chiefs and Battalion Chiefs. (Deaver Dep. 42:3-11, ECF No. 24-5.)

23. Any station personnel, including Captains, may be in charge of the fire engine and the emergency scene depending on where they sit in the fire engine or when they arrive on the scene. (*See, e.g.*, Deaver Dep. 67:17-69:19, ECF No. 24-5; Hughes Dep. 53:2-17, ECF No. 24-1; Weymouth Dep., 57:1-58:25, ECF No. 24-2.)[7]

24. Captains respond to emergency calls, fight fires, participate in fire prevention, and inspect both buildings and businesses. (Deaver Dep. 49:24-50:8, ECF No. 24-5; Hughes Dep. 11:25-12:4, ECF No. 24-1; Dep. of Paula Reid ("Reid Dep.") 69:20-71:21, ECF No. 23-7.)

25. Captains are not required to respond to emergency calls when they are not assigned to an engine's minimum staffing. (Deposition of Anthony E. McDowell ("McDowell Dep.") 86:21-87:9, ECF No. 21-18.) Moreover, Captains may choose to remove themselves from a "slot" on a particular engine, so long as minimum staffing is maintained. (McDowell Dep. 86:21-87:9, ECF No. 21-18.)[8]

---

[7] The Parties characterize this fact slightly differently; however, an analysis of the record shows that Fact ¶ 23 is not genuinely in dispute. Defendant states that "[o]n emergency scenes, Captains direct on-scene personnel and determine whether additional resources are necessary." (Def.'s Mem. Supp. at 10 ¶ 33.) Plaintiffs allege that on the scene of an emergency, "Captains serve as another firefighter, very similar to the role of non-exempt Lieutenants . . . . They may direct the scene, but often do not." (Pls.' LDF ¶ 33.) The Parties, therefore, are in agreement that Captains can and do direct the scene of an emergency.

Fact ¶ 23 is not called into dispute by the competing fact that Lieutenants, Firefighters, or even the Battalion Chief could direct the emergency scene depending on when they arrive and where they sit in the engine. (*See, e.g.*, Deaver Dep. 67:17-69:19, ECF No. 24-5; Hughes Dep. 53:2-17, ECF No. 24-1; Weymouth Dep., 57:1-58:25, ECF No. 24-2.)

[8] Plaintiffs dispute Fact ¶ 25 by arguing that "Captains are regularly counted as part of a crew and as such are *required* to respond to *all* calls for service." (Pls.' LDF ¶ 35 (emphasis added).) Plaintiffs further characterize Captains' ability to "shirk first responder duties" as "theoretical," and they argue that Captains "as a practical matter . . . respond to all calls for service." (Pls.' LDF ¶ 35; *see also* Pls.' Mem. Supp. at 5 ¶ 19 ("Fire Captains go out on nearly all emergency calls that come into their station" (citing Deaver Dep. 64:8-65:13, ECF No. 24-5)).)

26. Captains are given the "broad discretion" to choose not to respond to calls, even if there are only two other Firefighters available to respond. (McDowell Dep. 89:3-18, ECF No. 21-18; *see also* Baxter Dep. 96:17-97:14, ECF No. 21-13 ("It would not be a normal course of business to do that, but I do have authority, as station captain, to not go on a call – and they would ride short on that call, . . . but I do have that authority in a way that other people at that station don't.").)

### 2. Preplanning

27. The different shifts are responsible for "preplanning" responses to buildings within a certain geographical area. (*See* Hughes Dep. 147:5-9; 148:9-11, ECF No. 23-1; *see also* McDowell Aff. ¶ 16, ECF No. 21-1.)

28. Captains assign the shifts to certain geographical areas for preplanning. (*See* Hughes Dep. 147:5-9, 148:12-20, ECF No. 23-1; *see also* McDowell Aff. ¶ 16, ECF No. 21-1.)

29. The Fire Chief "expect[s] Fire Captains to apportion [preplanning] work among shifts and ensure that such work is satisfactorily accomplished." (McDowell Aff. ¶ 16, ECF No. 21-1.)

30. "When subordinates or shifts fail to perform the work assigned to them, and the station thereby fails to meet its inspection targets or develop required pre-plans, Fire Captains are responsible

---

Plaintiffs' characterization of the record, however, does not call Fact ¶ 25 into dispute. Baxter testified that Captains respond to calls when the Captain is assigned to a particular unit as part of its minimum staffing, not that Captains respond to all calls generally. (*See* Baxter Dep. 39:5-41:5, ECF No. 24-6.) Moreover, it is undisputed that Captains have the discretion to remove themselves from an engine so long as minimum staffing is otherwise satisfied. (McDowell Dep. 86:21-87:2, ECF No. 21-18; *cf.* Baxter Dep. 96:17-97:14, ECF No. 21-13 (noting that, although unusual, a Captain does have the authority to not go on a call, even if minimum staffing is not otherwise satisfied).)

Furthermore, Hughes merely testified that he responded to fires and emergency situations, "anywhere from 10 to 15 calls a shift," not that he responded to *all* calls. (Hughes Dep. 233:12-19, ECF No. 24-1.) Likewise, Weymouth simply testified that she would drop paperwork to go out on calls, not that she responded to *all* calls. (Weymouth Dep. 195:10-18, ECF No. 24-2.)

Based on the record as cited by Plaintiffs, there are no contravening facts that call into dispute the fact that Captains are not required to respond to calls if minimum staffing is otherwise maintained.

for holding personnel accountable and formulating a plan to achieve the desired goals."

(McDowell Aff. ¶ 16, ECF No. 21-1; *see also* Weymouth Dep. 80:23-90:14, ECF No. 21-9.)[9]

**D. Firefighters and Lieutenants**

31. During emergency situations, Firefighters can be in charge of all personnel at the scene if the Firefighter sits in a certain spot in the fire engine. (Hughes Dep. 53:2-13, ECF No. 23-1.)

32. Outside of emergency situations, Firefighters are sometimes given supervisory duties and can help write the budget which is later approved by a Captain. (Hughes Dep. 40:18-41:9, ECF No. 23-1; Weymouth Dep. 48:24-49:3, ECF No. 21-9.)

33. Firefighters can also develop training at their respective stations, decide where to develop preplans, conduct business inspections, complete daily assigned tasks, and repair specialized equipment. (Hughes Dep. 143:1-15, 147:10-148:8, 159:17-160:7, ECF No. 23-1; Deaver Dep. 31:4-24, 17:2-19:24, ECF No. 23-5.)

34. Firefighters also help with the upkeep of the fire station by cleaning it, mowing the lawn, cleaning windows, cleaning the refrigerator, going grocery shopping, cooking meals for the station, inspecting breathing apparatus, and inspecting the engine. (Deaver Dep. 30:7-13, 46:2-49:1, 49:24-50:8, ECF No. 23-5.)

35. Firefighters perform daily apparatus and station cleaning along with maintenance duties. (Baxter Dep. 53:13-54:4, ECF No. 21-13; Spencer Dep. 40:21-43:15, ECF No. 21-12; Redford Dep. 76:15-24, ECF No. 21-11.)

36. Firefighters cannot refuse to clean the station or perform other Non-Exempt work. (Redford Dep. 48:5-8, ECF No. 21-11.)

---

[9] Plaintiffs do not dispute this fact. While Plaintiffs do list Defendant's Fact ¶ 12 as disputed, the content of the dispute is actually with Defendant's Fact ¶ 13. (*Compare* Def.'s Mem. Supp. at 4 ¶¶ 12, 13, *with* Pls.' LDF ¶ 12.)

37. Firefighters go through physical training, including ropes and knots training, ventilation training, and fire hose training. (Hughes Dep. 114:14-115:5, ECF No. 23-1.)

38. Firefighters can serve on specialty teams, meaning they focus on a specific type of rescue situation. (Deaver Dep. 11:6-12:16, ECF No. 23-5.)

39. Lieutenants perform the same duties as Firefighters. (*See, e.g.*, Deaver Dep. 30:7-13, 46:2-49:1, 49:24-50:8, ECF No. 23-5.)

40. Lieutenants run the day-to-day operations of the station if a Captain is not on duty. (Hughes Dep. 14:23-15:9, ECF No. 23-1; Weymouth Dep. 16:12-14, 168:12-169:3, ECF No. 24-2.)

41. Even when a Captain is on duty, Lieutenants remain in charge of their shifts. (Hughes Dep. 51:5-20, 53:2-10, ECF No. 23-1; Weymouth Dep. 55:23-56:4, ECF No. 24-2; Deaver Dep. 49:2-23, 53:4-12, ECF No. 23-5.)

42. Lieutenants, when asked to do so by their Captain, also assign daily tasks among the Firefighters on their particular shift. Captains, however, remain responsible for apportioning work among the shifts at their station. (Weymouth Dep. 34:18-35:4, ECF No. 24-2.)

43. Lieutenants typically determine the type of training needed for their shift. (Deaver Dep. 55:13-58:13, ECF No. 23-5.) Captains, however, may direct their Lieutenants to focus on a particular area of training. (Deaver Dep. 55:25-56:4, ECF No. 23-5.)

44. Firefighters are compensated at a level between grades 23 and 28, depending on their level of experience. (Reid Aff. ¶ 20, ECF No. 21-2.) Their base annual pay range is therefore anywhere from $41,318.83 to $93,861.97. (Reid Aff., Ex. 2-E at 115, ECF No. 21-3.)

45. Lieutenants are compensated at a grade of 30. (Reid Aff. ¶ 19, ECF No. 21-2.)[10]  Their base

   annual pay range is therefore anywhere from $57,369.98 to $103,809.46. (Reid Aff., Ex. 2-E at

   115, ECF No. 21-3.)

## E. Fire Captains

### 1. Compensation

46. Fire Captains are compensated at a grade of 33. (Reid Aff. ¶ 18, ECF No. 21-2.)  Their base

   annual pay range is therefore anywhere from $66,034.64 to $118,659.22. (Reid Aff., Ex. 2-E at

   115, ECF No. 21-3.)

47. Plaintiffs testified that they were paid more than $455 per week, and that they were paid their

   salaries without regard to the number of hours they actually work. (*See* Weymouth Dep.

   189:23-190:3, ECF No. 21-9; Hughes Dep. 217:5-21, ECF No. 21-10; Redford Dep. 112:3-5,

   ECF No. 21-11; Spencer Dep. 124:9-125:4, ECF No. 21-12.)

### 2. Work Performed by Captains

48. HFD expects Captains to act as the single point of command, communication, and oversight for

   each station. (McDowell Aff. ¶¶ 9-10, ECF No. 21-1; Baxter Dep. 88:15-22, ECF No. 21-13).[11]

---

[10] Plaintiffs concede that Lieutenants are compensated at a lower grade than Captains, but argue that
Lieutenants "can and often do earn more in total compensation than Captains due to their
eligibility for overtime compensation." Moreover, Plaintiffs argue that "[s]ome Lieutenants have
refused to seek promotion to Captain because doing so would amount to a pay cut." (Pls.' LDF
¶ 44.)  This fact, however, is immaterial to the disposition of this case.  For purposes of
exemptions under the FLSA, courts do not look to "potential annual salaries." *Keller v. City of
Columbus, Ind.*, 778 F. Supp. 1480, 1489 (S.D. Ind. 1991).  Indeed for purposes of the Executive
Exemption analysis, "[i]t is inconsequential that Firefighters may work more hours and thereby
bring their annual earnings closer to the fixed salary paid to [C]aptains." *Id.*

[11] Plaintiffs dispute a portion of Fact ¶ 48, arguing that Lieutenants and Firefighters, when acting as
the officer in charge, perform the same command, communication, and oversight functions as
Captains. (Pls.' LDF ¶ 6.)  First, however, Plaintiffs do not factually dispute Baxter's and
McDowell's testimony that HFD expects Captains to remain ultimately responsible for their
stations' readiness, even when off-duty. (*See* Baxter Dep. 88:15-22, ECF No. 21-13; McDowell
Aff. ¶¶ 9-10, ECF No. 21-1.)  Rather, Plaintiffs argue that HFD expects not only Captains, but

When Captains are not on-duty at the station, Lieutenants or Firefighters, acting as the officer in charge, will take on some of the responsibilities of the Captain. (*See, e.g.*, Hughes Dep. 36:8-13, ECF No. 24-1.) Even so, there are still "just a couple things that they can't do that [the Captain] simply could do." (Hughes Dep. 36:11-16, ECF No. 24-1.)

49. "HFD relies on its Captains to ensure the operation readiness of the personnel and equipment assigned to each station." (McDowell Aff. ¶ 9, ECF No. 21-1.) Whether a Captain is on-duty or off-duty, he remains ultimately responsible for his station. (McDowell Aff. ¶ 10, ECF No. 21-1; *see* Baxter Dep. 88:15-22, ECF No. 21-13 (noting that even if a Captain is off-duty and there is another officer in charge, a Captain is still "always a Captain").)[12]

50. As the point of contact between HFD and their stations, Captains communicate to their stations and ensure their compliance with applicable HFD policies, Henrico County rules and regulations, and operation protocols. (McDowell Aff. ¶ 20, ECF No. 21-1.)[13]

---

also Firefighters and Lieutenants, to ensure operational readiness, because they are operationally in charge when the Captain is off-duty. (Pls.' LDF ¶ 6.)

The record portions cited by Plaintiffs do indeed show that Lieutenants or Firefighters take on some of the Captains' duties when he is not present at the station. (*See* Hughes Dep. 36:8-13, 230:14-231:5, ECF No. 24-1; Weymouth Dep. 27:9-24, 169:4-17, ECF No. 24-2; Redford Dep. 23:8-23:22, ECF No. 24-3.) Again, however, the facts provided by Plaintiffs, do not contravene the testimony of Baxter and McDowell, (*see* McDowell Aff. ¶ 10, ECF No. 21-1; *see* Baxter Dep. 88:15-22, ECF No. 21-13), which indicates that HFD expects the Captains to be ultimately responsible for their stations. Accordingly, Fact ¶ 48 is not in dispute.

[12] The Court finds that Fact ¶ 49 is not genuinely in dispute. *See supra* Fact ¶ 48 & Footnote 11.

[13] Plaintiffs dispute Fact ¶ 50, arguing that Lieutenants also ensure compliance with HFD policy and, thus, that Captains are not *the* point of contact between HFD and the stations. (Pls.' LDF ¶ 14.) The portions of the record cited by Plaintiffs, however, do not call into dispute the fact that Captains are the point of contact for their stations. The record shows that while Captains are off-duty, Lieutenants have enforced compliance with policies, (*see* Deaver Dep. 59:14-60:9, ECF No. 24-5), and that Battalion Chiefs fill in on the role of "command and supervision over lieutenants and firefighters" (Redford Dep. 22:22-23:22, ECF No. 24-3.) However, these facts do not contravene the Captain's role as the point of contact for a station. Indeed, Lieutenant Deaver testified that, while he may handle some matters without the Captain, "there are certain things that are written in the SOGs and also the County policies and rules and regulations that are

51. Captains are ultimately responsible for developing, reviewing, and forwarding up the chain of command budgets for specialty shops that operate out of their stations. (McDowell Aff. ¶ 11, ECF No. 21-1; *see* Weymouth Dep. 48:25-49:7, ECF No. 21-9; Spencer Dep. 89:13-93:14, ECF No. 21-12; Redford Dep. 72:16-21, ECF No. 21-11.) Captains may assign or delegate preliminary budget development to their subordinates; however, Captains remain "ultimately responsible" for their budgets and are responsible for keeping their shops within budget. (*See* Spencer Dep. 91:4-6, ECF No. 24-4; Weymouth Dep. 122:13-123:4, ECF No. 24-2.) [14]

52. If a Captain fails to ensure the completion and submission of a budget on time, the Captain is potentially subject to corrective or disciplinary action. (McDowell Aff. ¶ 12, ECF No. 21-1; *see also, e.g.,* Oct. 10, 2011 Performance Counseling Session Memo to Captain James R. Redford, ECF No. 21-16 (counseling Redford on his failure to ensure the timely completion of a budget).)

53. Captains, in addition to Battalion Chiefs and Lieutenants, can serve as points of contact between contractors and Henrico County agencies when construction work needs to be done on their stations. In so doing, Captains can also perform *some* supervision and coordination of the construction. (*See* Spencer Dep. 31:14-33:20, ECF No. 24-4; Hughes Dep. 126:3-134:22, ECF

---

beyond [his] control. At that point, [he] will contact the Captain and, if needed, the district chief for the day, apprise them of the situation, gather the information, and then forward that information on up the line for the administration." (Deaver Dep. 60:3-9, ECF No. 24-5.) This testimony indicates that Lieutenants do serve a role in communication between HFD and the stations, but that Captains have a role above that of the Lieutenants. That is, even when off-duty, Captains are still responsible for their stations. *Cf. supra* Fact ¶¶ 48-49 & Footnotes 11-12. Accordingly, the Court finds that Fact ¶ 50 is not genuinely in dispute.

[14] Plaintiffs dispute the role that Captains play in the budget process at stations with "specialty shops." (Pls.' LDF ¶ 37.) Plaintiffs argue that actual budget development falls to Non-Exempt employees. (Pls.' LDF ¶ 37.) However, Plaintiffs have not disputed that Captains remain ultimately responsible for their budgets. Indeed, the portions of the record cited by Plaintiffs indicate that, although a Captain may delegate or assign budget development to subordinates, the Captain remains responsible for his station's budget. (*See* Spencer Dep. 91:16-92:6, ECF No. 24-4; Weymouth Dep. 122:13-123:18, ECF No. 24-2.) Accordingly, the Court finds that fact ¶ 51 is not genuinely in dispute.

No. 21-10; Redford Dep. 25:1-26:9, 84:3-87:12, ECF No. 21-11; *see also* McDowell Aff. ¶ 14, ECF No. 21-1; Affidavit of Andrew M. Baxter ("Baxter Aff.") ¶ 29, ECF No. 21-4.)[15]

54. The Fire Chief relies on Captains to oversee special, one-time projects. (McDowell Aff. ¶ 29, ECF No. 21-1.) Weymouth oversaw a project involving the organization and coordination of procedures for search and rescue calls in conjunction with the police department. (Weymouth Dep. 139:8-141:3, ECF No. 21-9.) Hughes served as the liaison for legislative initiatives to the Virginia General Assembly. (Hughes Dep. 24:16-28:11, ECF No. 21-10.)

55. Captains help with station upkeep by washing trucks, cleaning equipment, and other tasks that Firefighters and Lieutenants perform. (Hughes Dep. 232:22-233:19, ECF No. 23-1; Baxter Dep. 51:15-55:4, ECF No. 21-13; Deaver Dep. 30:7-13, 46:2-49:1, 49:24-50:8, ECF No. 23-5.)

56. Captains are not required to perform Non-Exempt work such as "clean[ing] the apparatus, clean[ing] the station, [or] maintain[ing] the grounds." (Redford Dep. 48:5-23, ECF No. 21-11; see Spencer Dep. 41:14-22, 42:6-8, ECF No. 21-12.) Captains would only be required to perform such work "[i]f the battalion chief came in and ordered" them to do so because no other personnel were present. (Redford Dep. 48:9-23, ECF No. 21-11.)

57. Captains respond to emergency calls and assist in preparing their station for emergency situations. (Baxter Dep. 39:5-8, ECF No. 21-13; Deaver Dep. 27:7-15, 36:17-22, ECF No. 23-5;

---

[15] Plaintiffs dispute the role of Captains during construction projects. (Pls.' LDF ¶ 8.) Plaintiffs allege that Captains "have absolutely no discretion or ability to order station repair." (Pls.' LDF ¶ 8.) Defendant, however, did not assert that Captains had such discretion. (*See* Def.'s Mem. Supp at 3 ¶ 8.) Moreover, the portions of the record cited by Plaintiffs (also cited by Defendant) indicate that Captains do in fact play a supervisory role when construction work is done on their stations. For example, Spencer testified that—during construction on his station—a Lieutenant reported an issue with the contractor to Spencer because the Lieutenant "didn't want full responsibility; he wanted some backing on it." (Spencer Dep. 31:21-32:9.) Accordingly, the Court does not find there to be a genuine dispute as to Fact ¶ 53.

Hughes Dep. 11:25-12:4, 178:10-16, ECF No. 23-1; Reid Dep. 69:20-71:21, 73:1-18, ECF No.

23-7; Samuels Dep. 28:12-29:10, 35:2-5, ECF No. 24-8.)[16]

58. When an emergency call comes into their station, the Captain has the authority to divert the call

to another station, "based on their professional judgment and in consideration of factors . . .

associated with the call." (McDowell Aff. ¶ 27, ECF No. 21-1; *see* Weymouth Dep 103:3-23,

ECF No. 24-2.)[17]

59. From June 2013 through May 2014, the engine that responded to the most emergency calls

throughout all of Henrico County spent approximately ten percent of its time responding to

emergency calls. The medical unit that responded to the most emergency calls during the same

period spent approximately twenty-seven percent of its time responding to emergency calls.

(Shukoor Aff. ¶ 10, ECF No. 21-6; *see also* McDowell Dep. 159:17-21, ECF No. 21-18 ("The

busiest fire engines in Henrico County spend about 11 or 12 percent of their time on calls for

service.").) HFD has calculated that, from January 1, 2011 to March 31, 2015, Plaintiffs have

---

[16] Plaintiffs allege as an undisputed fact the proposition that "Fire Captains perform[] first responder duties with the same frequency as non-exempt firefighters." (Pl.'s Mem. Supp. at 12 ¶ 72.) The Reid deposition, however, cited by Plaintiffs in support of this alleged fact does not at all support the proposition that Captains perform these duties with the same frequency as Non-Exempt Firefighters. (*See* Reid Dep. 96:22-97:2, ECF No. 23-7.) Rather, Reid's answer merely recognized that although Captains perform first responder duties, the HFD classifies them as managers; there was no mention as to the amount of time Captains spend performing first responder duties. (*See* Reid Dep. 96:22-97:2, ECF No. 23-7.) While the record does not support the proposition that Captains perform first responder duties with the same frequency as Firefighters, it remains undisputed that Captains respond to emergency calls.

[17] Plaintiffs dispute Fact ¶ 58, arguing that Captains have this authority "when they are the ranking officer at the station." (Pls.' LDF ¶ 34.) First, however, the portion of the record cited by Plaintiff does not indicate that Captains can only divert calls when they are the ranking officer at the station. (*See* Weymouth Dep. 103:6-23, ECF No. 24-2.) Second, the proposition that a higher ranking officer, if present at the station, would have this authority is unremarkable and does not serve to bring this fact into dispute. It stands to reason that if a Division, Battalion, or Fire Chief were present at the station, their order outrank that of the Captain. What is important is that Captains have the authority to divert calls from their station if—in their judgment—their station is unable to handle a call. Accordingly, the Court finds that Fact ¶ 58 is not genuinely in dispute.

spent two to three percent of their on-duty time responding to emergency calls. (Shukoor Aff. ¶¶ 16-17, ECF No. 21-6.)[18]

60. When asked if there are any differences between Lieutenants and Captains, Lieutenant Deaver testified: "Yeah. Well, he is responsible for the whole station. He is responsible for the station, the inventory, everything within that station, the apparatus, everything, he is responsible. He is ultimately responsible for the performance of his lieutenants and also he is ultimately responsible for the performance of the firefighters. In addition to that, whatever projects that may be delegated from fire administration, they have to full that obligation. . . . They do everything that I do, but they just get more put on their plate." (Deaver Dep. 75:19-76:6, ECF No. 21-15.)

61. Captains work directly with the Lieutenants and Firefighters in their station. (See, e.g., Hughes Dep. 50:7-15, ECF No. 21-10.)

62. Captains "ensure the timely completion of operation reports by all three shift supervisors." (McDowell Aff. ¶ 22, ECF No. 21-1; see, e.g., Redford Dep. 28:16-21, ECF No. 21-11.) If a Captain is off-duty, the acting officer will complete reports. (See Weymouth Dep. 27:4-30:9,

---

[18] Plaintiffs dispute Fact ¶ 59, arguing that "HFD personnel spend significant time responding to emergencies and ensuring preparedness for the same." (Pls.' LDF ¶ 36.) While it is true that Chief McDowell testified that "preparedness was 'continuous,'" he also testified that the busiest fire engines in the County spend only about eleven to twelve percent of their time on emergency calls. (McDowell Dep. 159:17-21, 160:1, ECF No. 21-18.) Moreover, Hughes' testimony does not indicate any sort of percentage or comparison of time spent on emergency calls; rather, he merely testified that his station "probably respond[s] on anywhere from 10 to 15 calls a shift." (Hughes Dep. 233:12-19, ECF No. 24-1.) Moreover, Hughes did not testify that he spends "significant time . . . investigating incidents and preparing reports and paperwork regarding those incidents." (Pls.' LDF ¶ 36.) Rather, the portion of Hughes' testimony cited by Plaintiffs reads, in relevant part, that investigations "depend[] on the nature and the significance" of the fire and that the station personnel "informally conduct investigations into the causes of fires and then perform the related paperwork." (Hughes Dep. 33:17-34:2, ECF No. 24-1.) Plaintiffs have provided no facts to controvert Defendant's facts regarding the percentage of time that HFD personnel actually spend responding to emergencies. Accordingly, the Court finds that Fact ¶ 59 is not genuinely in dispute.

ECF No. 21-9; Spencer Dep. 47:7-48:10, ECF No. 21-12.) Regardless, if reports are not being completed, the affected Battalion Chief will hold a station's Captain responsible. (Weymouth Dep. 30:3-9, ECF No. 21-9.)[19]

63. "Battalion and District Chiefs leave the day-to-day management of a station to the Fire Captains." (McDowell Aff. ¶ 33, ECF No. 21-1.)[20]

64. Captains report to a Battalion Chief or District Chief, who works on a different shift from the Captains. (McDowell Aff. ¶ 32, ECF No. 21-1; *see* Spencer Dep 17:2-6, ECF No. 21-12; Hughes Dep. 15:6-10, ECF No. 21-10; Redford Dep. 15:18-16:4, ECF No. 21-11; Weymouth Dep. 12:24-13:20, ECF No. 21-9.)[21]

65. Due to working on different shifts, Captains and their supervisors have overlapping schedules on one-third of their on-duty days. (McDowell Aff. ¶ 32, ECF No. 21-1.)

66. Battalion Chiefs are responsible for multiple stations and move among them on a daily basis. (*See* Samuels Dep. 24:12-27:7, ECF No. 24-8.)

---

[19] Plaintiffs dispute Fact ¶ 62, alleging that Lieutenants also ensure the timely completion of reports. (Pls.' LDF ¶ 15.) Plaintiffs are correct to note that Lieutenants, as acting officers, complete operational reports. (*See* Weymouth Dep. 27:4-30:9, ECF No. 21-9; Spencer Dep. 47:7-48:10, ECF No. 21-12; Redford Dep. 28:16-21, ECF No. 21-11.) The Court has considered the role of Lieutenants in its analysis, but does not find that Lieutenants' role in completing operations reports calls into dispute the fact that Captains are also responsible for ensuring the completion of operational reports. Furthermore, although Plaintiffs have correctly noted that Lieutenants work to complete reports, they have not offered any facts to contravene McDowell's testimony that Captains ensure the completion of reports by their "three shift supervisors," (that is, the Lieutenants). (McDowell Aff. ¶ 22, ECf No. 21-1.) Accordingly, the Court finds that Fact ¶ 62 is not genuinely in dispute.

[20] Plaintiffs do not dispute Fact ¶ 63. (*Compare* Def.'s Mem. Supp. at 13 ¶ 42, *with* Pls.' Mem. Supp. at 7-8.)

[21] Plaintiffs dispute Defendant's proffered facts related to Captains' freedom from supervision. (*Compare* Def.'s Mem. Supp. at 13 ¶ 41, *with* Pls.' LDF ¶ 41.) Comparing the facts cited by both Parties, the Court finds that there are no genuine disputes. To the extent the facts proffered by either party are material and relevant, the Court presents them here. *See infra* Fact ¶¶ 62-63; *supra* Fact ¶¶ 65-67.

67. Chiefs do not "shadow" their Captains or constantly "look over their shoulders." (Weymouth

Dep. 53:15-54:7, ECF No. 21-9 ("I would say the majority of the time that I may see . . . a

battalion in a given month's time, maybe three or four times."); Redford Dep. 77:18-22, ECF

No. 21-11 (noting that Chiefs do not look over his shoulder); Spencer Dep. 111:4-6, ECF No.

21-12 (Chiefs not shadowing him on a daily basis); *see* Hughes Dep. 49:2-21, ECF No. 21-10

(when Chiefs "drop by" to a station, they stay for one to two hours).)

### 3. Captains' Supervision of Other Employees

68. While serving as station Captains, Plaintiffs supervised the three shifts in their station, each of

which typically consisted of one Lieutenant and three Firefighters. (Weymouth Dep. 15:13-

18:6, ECF No. 21-9 (one Lieutenant and three to four Firefighters per shift); Hughes Dep.

13:12-14:22, ECF No. 21-10 (two Lieutenants and six to seven Firefighters per shift); Spencer

Dep. 7:18-8:22, ECF No. 21-12 (one Lieutenant and four Firefighters per shift); Redford Dep.

10:1-11:21, ECF No. 21-11 (one Lieutenant, three Firefighters, and two medics per shift).)[22]

69. Captains are expected to direct the work of all personnel assigned to their stations. (*See* Reid

Aff. Exs. 2-A, 2-C, ECF No. 21-3; *see also* McDowell Aff. ¶¶ 9, 15, 23, ECF No. 21-1.)[23]

---

[22] Plaintiffs do not specifically dispute Fact ¶ 68. (*Compare* Def.'s Mem. Supp. at 4 ¶ 10, *with* Pls.' Resp. at 3-8.) To the extent that Plaintiffs may dispute that Plaintiffs supervised the three shifts in their stations, (*see* Pls.' LDF ¶ 9), the Court finds that there is no genuine dispute for the reasons discussed *infra* in Fact ¶¶ 6-7 and Footnotes 3-4.

[23] Plaintiffs dispute Fact ¶ 69. (Pls.' LDF ¶ 9.) Plaintiffs are correct to note that Lieutenants, as the Firefighters' immediate superiors, do have a role in formulating objectives and directing work. (*See* Hughes Dep. 50:18-51:1, ECF No. 24-1.) Plaintiffs are also correct to note that "[i]f the captain goes in and changes the goals and objectives of that day of what [Firefighters and Lieutenants] are doing, it makes things difficult to operate. (Hughes Dep. 50:24-51:1, 51:7-14, ECF No. 24-1.) These facts, however, are immaterial and do not contravene the fact that Captains are expected to direct the personnel at their station. Indeed, Weymouth's testimony, cited by Plaintiffs to dispute Fact ¶ 69, indicates that Lieutenants coordinate the functions on their particular shifts, but that Captains oversee all three station shifts and delegate the work among the three shifts. (Weymouth Dep. 23:7-24, ECF No. 24-2.) Accordingly, the Court finds that Fact ¶ 69 is not genuinely in dispute. *Cf. supra* Fact ¶ 7 & Footnote 4.

70. Captains "provide direction and supervision" to their three "direct reports, the three shift lieutenants." (Baxter Dep. 55:7-9, ECF No. 21-13.) Captains mentor and counsel their Lieutenants about performance concerns. (McDowell Aff. ¶ 23, ECF No. 21-1; *see* Redford Dep. 68:15-69:2, ECF No. 21-11; Hughes Dep. 60:9-14, ECF No. 21-10.) In so doing, they ensure that their station is operating as it should. (*See* Baxter Dep. 55:5-56:2, ECF No. 21-13.)

71. Captains ensure that their stations' personnel are properly trained, and Captains are ultimately responsibility to ensure that the shifts are satisfactorily completing in-station training and participating in division-wide training. (McDowell Aff. ¶ 18, ECF No. 21-1; Weymouth Dep. 35:20-24, ECF No. 24-2; Redford Dep. 32:8-13, ECF No. 21-11; Spencer Dep. 59:16-61:8, ECF No. 21-12; Hughes Dep. 109:13-112:4, ECF No. 21-10.)[24]

72. Captains maintain secure personnel records for their station, including evaluations, commendations, and documents related to counseling and discipline. (Weymouth Dep. 106:2-107:6, ECF No. 21-9; Hughes Dep. 76:5-78:2, ECF No. 21-10; Spencer Dep. 43:25-44:8, ECF No. 21-12.)

---

[24] Plaintiffs list the fact that Captains must ensure the training of all members in their station as disputed. (Pls.' LDF ¶ 12.) However, Plaintiffs do not dispute that Captains are ultimately responsible for ensuring that their personnel are properly trained. Rather, Plaintiffs cite to the record indicating that both Lieutenants and Captains participate in training. (*See* Deaver Dep. 22:24-23:14, 22:21-24:4, ECF Nos. 23-5, 24-5.) However, Weymouth specifically testified that she is responsible for making sure that all three shifts meet their training obligations. (Weymouth Dep. 86:2-11, ECF No. 24-2.) If a shift is failing to meet its obligations, a Captain may then address the issue with a particular shift's Lieutenant. (Weymouth Dep. 86:8-11, ECF No. 24-2.) Moreover, Weymouth testified that she has the final word in ensuring that all training is completed so as to approve individuals to serve as acting officers. (Weymouth Dep. 110:4-22, ECF No. 24-2.) In short, while Lieutenants may have involvement in the training of Firefighters, it is ultimately the Captain's responsibility to ensure that personnel at his station are trained properly. Accordingly, the Court finds that Fact ¶ 71 is not genuinely in dispute.

73. ". . . Captains, with the approval of affected Battalion Chiefs and the Division Chief, may initiate or approve transfers within their station from unit to unit or shift to shift." (McDowell Aff. ¶ 17, ECF No. 21-1.)[25]

### 4. Captains' Role in Employment Decisions

74. The Fire Chief is the only employee of HFD who has the final authority to hire, fire, demote, or promote an employee. (Baxter Dep. 56:3-12, ECF No. 21-13; Weymouth Dep. 72:6-9, ECF No. 21-9; Hughes Dep. 83:12-84:2, ECF No. 21-10; McDowell Aff. ¶¶ 34, 37, ECF No. 21-1.)

---

[25] Plaintiffs dispute the role of Captains in making transfers. (Pls.' LDF ¶ 32.) Specifically, Plaintiffs argue that Captains, similar to Lieutenants, may be—but are not always—consulted before transfers to/from stations and shifts are made. (Pls.' LDF ¶ 32.) Plaintiffs similarly note that Captains, like Lieutenants, may recommend/request transfers, but "lack the authority to effect or reject a transfer." (Pls.' LDF ¶ 32.)

Spencer's testimony confirms that Captains are not always consulted before transfers are made; however, it does not call into dispute McDowell's testimony that Captains may initiate or approve transfers with the blessing of the Battalion and Division Chief. (*Compare* Spencer Dep. 50:12-51:13, ECF No. 24-4, *with* McDowell Aff. ¶ 17, ECF No. 21-1.)

Likewise, the Deaver deposition indicates that the affected Chief may first consult with a Lieutenant before transferring personnel from his station; however, it does not dispute the fact that Captains may initiate or approve transfers with the approval of the affected Chiefs. (Deaver Dep. 22:10-14, ECF No. 24-5.) Finally, the Hughes Deposition does not call this fact into dispute. Rather, it supports the proposition that Captains—while not having unilateral authority to affect a transfer—have a say, even if only as a matter of consultation, in the transfer process. (Hughes Dep. 189:20-190:17, 190:23-192:23, ECF No. 21-10.) Hughes even testified to having a say as to who in particular was transferred after the Chief required a transfer. (Hughes Dep. 190:12-14, ECF No. 21-10 ("I would go to the shift lieutenants and say, Hey we're going to lose somebody; can you give me a recommendation of who would be the best person to move.").) Finally, Hughes merely speculated that Captains could not initiate in-station transfers among the three station shifts. (Hughes Dep. 188:19-189:19, ECF No. 21-10.) Hughes did testify, however, that Lieutenants lack the authority to initiate in-station shift transfers. (Hughes Dep. 189:17-19, ECF No. 21-10.)

Given that Plaintiffs' citations to the record merely indicate that Lieutenants and Captains have overlapping roles in the transfer process and reinforce the proposition that Captains are involved in the station to station transfer process, (*see* Hughes Dep. 190:12-14, ECF No. 21-10), the Court finds that Fact ¶ 73 is not genuinely in dispute.

75. Before making a promotion, the Fire Chief considers the recommendations of a promotional interview panel, its scores, and the comments of its individual members. (McDowell Aff. ¶ 37, ECF No. 21-1 ("I also listen and give particular weight to the comments and recommendations made by each member of the panel.").)

76. The Fire Chief personally meets with the promotional interview panel before making his decision. (Weymouth Dep. 150:11-16, ECF No. 24-2; *see* McDowell Aff. ¶ 37, ECF No. 21-1.)

77. Firefighters and Lieutenants are ineligible to sit on the interview panel for promotions from Firefighter to Lieutenant; to be eligible to sit on such a panel, an individual must be at least a Captain. (Weymouth Dep. 145:15-25, ECF No. 24-2.)

78. Captains have the opportunity to, and do in fact, sit on promotion interview panels. (Baxter Aff. ¶¶ 6-7, ECF No. 21-4.)[26]

79. Weymouth has sat on multiple promotional interview panels. (Baxter Aff. ¶ 7, ECF No. 21-4; Weymouth Dep. 141:13-20, ECF No. 21-9.)

---

[26] Plaintiffs essentially dispute Fact ¶ 78, arguing that Captains "sit on very few promotional panels [and that] two of the four Plaintiffs have not sat on any such panels." (Pls.' LDF ¶ 29.) Indeed, the record indicates that, of the Plaintiffs, only Weymouth has actually sat on a promotional panel. (*See* Weymouth Dep. 141:13-20, ECF No. 21-9; Hughes Dep. 177:9-16, ECF No. 24-1; Redford Dep. 61:2-13, ECF No. 21-11; Spencer Dep. 80:21-81:3, ECF No. 21-12.) Nonetheless, Plaintiffs' allegation does not create a genuine dispute as to the fact that Captains can and do sit on promotional interview panels.

The uncontroverted facts demonstrate that there have only been three Lieutenant promotion processes since June 2011. (Baxter Aff. ¶ 5, ECF No. 21-4.) During these processes, Weymouth sat on four promotional interview panels. (Baxter Aff. ¶ 7, ECF No. 21-4.) For the two panels held in 2014, Weymouth and four other Captains participated as panel members. (Baxter Aff. ¶ 6, ECF No. 21-4.) Furthermore, while it is true that Plaintiffs Hughes and Spencer have never sat on a promotional panel, it is also true that they never asked to sit on such a panel. (Hughes Dep. 177:9-16, ECF No. 24-1; Spencer Dep. 80:21-81:3, ECF No. 21-12.) Indeed, Redford even testified that a Captain's involvement in the hiring and promotional process is "on a voluntary basis." (Redford Dep. 55:24-56:9, ECF No. 21-11.) Moreover, despite not sitting on a promotional panel, on at least two occasions the Fire Chief personally asked Spencer for input on promotions. (Spencer Dep. 114:18-24, 116:12-17, ECF No. 21-12.) Accordingly, the Court finds that the fact that "Captains have the opportunity to, and do in fact, sit on promotion interview panels" is not genuinely in dispute.

80. Hughes, Redford, and Spencer have not sat on a promotional interview panel. (Hughes Dep. 177:9-16, ECF No. 24-1; Redford Dep. 61:2-13, ECF No. 21-11; Spencer Dep. 80:21-81:3, ECF No. 21-12.)

81. Whether or not they sit on a promotional interview panel, Captains have the opportunity to, and do in fact, offer their promotional recommendations to the Fire Chief—either on their own accord or when solicited by the Fire Chief. (*See* McDowell Aff. ¶¶ 38-40, ECF No. 21-1; *see, e.g.*, Weymouth Dep. 151:14-152:12, ECF No. 24-2; Spencer Dep. 114:18-116:22.)[27]

82. Spencer has written at least one letter of recommendation advocating for the promotion of a Firefighter to a Lieutenant; in that instance, the Fire Chief promoted the candidate. (Spencer Dep. 114:23-115:12, ECF No. 21-12.)

83. The Fire Chief has also personally called Spencer for promotional recommendations on at least three occasions. (Spencer Dep. 114:22-116:22, ECF No. 21-12.) On the two occasions involving promotion of Firefighters to Lieutenants, Spencer recommended both promotions. (Spencer Dep. 115:13-116:11, ECF No. 21-12.) The Fire Chief followed one recommendation initially, and the other candidate was promoted at a later time. (Spencer Dep. 115:13-116:11,

---

[27] Plaintiffs essentially dispute Fact ¶ 81, alleging first that the Fire Chief "does not place particular weight on Captains' letters of recommendation and/or recommendations for promotion candidates" and second that the Fire Chief "can and does disregard such recommendations." (Pls.' LDF ¶ 31.) Plaintiffs' first allegation is a legal conclusion, not a statement of fact; therefore, it does not bring Fact ¶ 81 into dispute.

Plaintiffs' second allegation is supported by the record; however, it does not create a genuine dispute of material fact. The record indicates that the Chief sometimes follows a Captain's recommendations and sometimes does not. (*See, e.g.*, Weymouth Dep. 151:14-152:12, ECF No. 24-2.) Regardless, the regulations do not require that an individual's recommendations be followed one hundred percent of the time for that individual to be considered an Exempt Executive. *See* 29 C.F.R. §§ 541.100(a)(4), 541.105 (noting that frequency of reliance on recommendations is a factor to consider, but not requiring total reliance on recommendations). The Court finds, therefore, that Fact ¶ 81 is not genuinely in dispute.

ECF No. 21-12.) On the occasion involving the promotion of a Lieutenant to a Captain, Spencer recommended the promotion, and the Fire Chief followed his recommendation. (Spencer Dep. 116:12-22, ECF No. 21-12.)

84. Weymouth served on the January 2013 promotional interview panel. Of the six candidates promoted, five were ranked by Weymouth as her top five. (Baxter Aff. ¶ 7, ECF No. 21-4.)

85. Weymouth served on the May 2013 promotional interview panel. Of the four candidates promoted, three were ranked by Weymouth as her top three. (Baxter Aff. ¶ 7, ECF No. 21-4.)

86. Weymouth served on the September 2013 promotional interview panel. Of the four candidates promoted, three were ranked by Weymouth as her top three. (Baxter Aff. ¶ 7, ECF No. 21-4.)

87. Weymouth served on the June 2014 promotional interview panel. Of the three candidates promoted, "the [Fire] Chief promoted each of Weymouth's top three ranked candidates." (Baxter Aff. ¶ 7, ECF No. 21-4.)

88. Captains have the opportunity to, and do in fact, sit on hiring interview panels. (Redford Dep. 56:10-61:1, ECF No. 21-11.)

89. Redford sat on one hiring interview panel as a Captain. (Redford Dep. 56:10-22, ECF No. 21-11.) Out of thirty candidates interviewed, the panel—as a whole—recommended the hiring of twelve. (Redford Dep. 58:19-59:8, ECF No. 21-11.) Of the twelve that the panel recommended, the Fire Chief hired eleven; the twelfth candidate, however, declined to accept the position. (Redford Dep. 58:19-60:1, ECF No. 21-11.)

90. On an annual basis, Captains conduct performance appraisals of their Lieutenants. (McDowell Aff. ¶ 25, ECF No. 21-1; Reid Aff. Ex. 2-A, ECF No. 21-3; Weymouth Dep. 59:17-62:22, ECF No. 21-9; Spencer Dep. 61:10-64:2, ECF No. 21-12; Hughes Dep. 58:5-63:2, ECF No. 21-10; Redford Dep. 69:3-71:4, ECF No. 21-11.)

91. Captains also review their Lieutenants' appraisals of Firefighters. If the Captain disagrees with a Lieutenant's appraisal, the Captain has the authority to reject or modify the appraisal. (McDowell Aff. ¶ 25, ECF No. 21-1; Reid Aff. Ex. 2-A, ECF No. 21-3; Weymouth Dep. 60:11-65:12, ECF No. 21-9; Spencer Dep. 64:3-65:3, ECF No. 21-12; Hughes Dep. 63:3-64:18, ECF No. 21-10; Redford Dep. 71:2-72:12, ECF No. 21-11.)

92. Captains are responsible for addressing, and in fact do address, deficiencies in their Lieutenants' performance. (McDowell Aff. ¶ 24, ECF No. 21-1; *see, e.g.*, Weymouth Dep. 79:3-93:18, ECF No. 21-9; Redford Dep. 68:15-71:1, ECF No. 21-11; Hughes Dep. 60:9-61:22, ECF No. 21-10.)

93. Captains are responsible for developing performance improvement plans and for ensuring that their Lieutenants implement the plans. (*See, e.g.*, Weymouth Dep. 94:3-105:22, ECF No. 21-9.)

94. Superior officers expect Captains to properly address performance issues in their station, and Captains are held accountable if they fail to appropriately address performance problems among their subordinates. (*See, e.g.*, Redford Dep. 89:18-92:17, ECF No. 21-11.)

95. Since June 2011, HFD has terminated one Firefighter for poor performance. (Baxter Aff. ¶ 22, ECF No. 21-4.) In that instance, the Firefighter's Captain had assisted with developing a performance improvement plan and determined that the Firefighter was not meeting the plan's expectations. Accordingly, the Captain recommended that the Firefighter's employment be terminated. (Baxter Aff. ¶ 22, ECF No. 21-4; *see also* Baxter Dep. 70:8-75:18, ECF No. 21-13.)

96. "HFD expects and relies upon Station Captains to identify and take steps to address potential infractions committed by personnel assigned to their stations." (Baxter Aff. ¶ 10, ECF No. 21-4.)[28]

---

[28] Plaintiffs dispute Fact ¶ 96, alleging that it is often the role of Lieutenants to identify and address misconduct. (Pls.' LDF ¶ 21.) The portion of the Weymouth deposition cited by Plaintiffs confirms that Lieutenants are involved in identifying and addressing misconduct. (*See* Weymouth Dep. 168:23-169:3, ECF No. 24-2.) The Deaver deposition confirms the role of Lieutenants as well; however, it also indicates that Lieutenants will consult with Captains

97. For minor issues and infractions, HFD "will typically rely on station captains to take appropriate action to address the issue outside the formal disciplinary process." (Baxter Aff. ¶ 13, ECF No. 21-4.) "Captains may recommend and impose oral 'counselings,' which are not considered disciplinary action, to correct their subordinates' behavior." (Baxter Aff. ¶ 13, ECF No. 21-4; *see, e.g.*, Hughes Dep. 93-101, ECF No. 21-10; Hughes Dep. Exs. 7-10, ECF No. 21-10.) Captains may impose a counseling without approval from superior officers. (Hughes Dep. 60:18-21, ECF No. 21-10.)[29]

98. For situations more serious than those warranting a counseling, HFD expects Captains to make recommendations up the chain of command regarding disciplinary action. (McDowell Aff. ¶ 34, ECF No. 21-1; Baxter Aff. ¶ 14, ECF No. 21-4.)[30]

99. Captains may recommend discipline; however, they lack the unilateral authority to impose discipline, such as written reprimands. (*See, e.g.*, Hughes Dep. 60:15-61:22, ECF No. 24-1.)[31]

100.   "To ensure fairness and consistency of discipline across [HFD], Station Captains' recommendations are . . . communicated up the chain of command for approval.  Once the

---

regarding misconduct at the station. (*See* Deaver Dep. 59:12-60:13, ECF No. 24-5.)  The fact that Lieutenants can also be involved in identifying and addressing misconduct, however, does not negate the fact that HFD expects Captains to do the same. (*See* Baxter Aff. ¶¶ 10-11, ECF No. 21-4.)  Accordingly, the Court finds that Fact ¶ 96 is not genuinely in dispute.

[29] Plaintiffs dispute the extent of Captains' ability to discipline and address misconduct, (*see* Pls.' LDF ¶¶ 20-23, 26); however, Plaintiffs concede that "Captains may issue mentoring or counseling" (Pls.' LDF ¶ 16).  Accordingly, the Court finds that Fact ¶ 97 is not genuinely in dispute.

[30] Plaintiffs essentially dispute Fact ¶ 98. (Pls.' LDF ¶ 23.)  First, however, Plaintiffs do not dispute HFD's expectations as to Captains' recommending discipline. (*See* Pls.' LDF ¶ 23.)  Second, Plaintiffs actually concede that Captains are able to recommend discipline. (*See* Pls.' LDF ¶¶ 22-23.)  Accordingly, Fact ¶ 98 is not genuinely in dispute.

[31] Plaintiffs essentially dispute Fact ¶ 99. (*See* Pls.' LDF 22-23.)  While Plaintiffs are correct in stating that Captains do not have unilateral authority to impose discipline, (*see* Pls.' LDF ¶ 22-23), Defendant never asserted that Captains have such authority (*see* Def.'s Mem. Supp at 8 ¶¶ 21-24.)  Accordingly, the Court finds that Fact ¶ 99 is not genuinely in dispute.

recommendation is approved, a Station Captain may be asked to impose the agreed-upon disciplinary action." (Baxter Aff. ¶ 14, ECF No. 21-4.)[32]

101.    For example, one of Redford's Firefighters had, on a few occasions, been so late in coming to work that he was technically considered to be absent without leave ("AWOL"). (Redford Dep. 102:17-103:3, ECF No. 21-11.) Redford was assigned to investigate the incident and ultimately recommended that the offending Firefighter be disciplined. (Redford Dep. 103:4-105:3, ECF No. 21-11.) Redford recommended that the Firefighter receive a written reprimand, although "[o]rdinarily, the discipline would have been more severe." (Redford Dep. 103:4-105:3, ECF No. 21-11.) Redford recommended the lighter discipline because the offender was "a good firefighter and [Redford] didn't want to see his career go down the toilet." (Redford Dep. 103:4-105:3, ECF No. 21-11.) Redford's superiors followed his recommendation and authorized Redford to impose a written reprimand, which he did. (Redford Dep. 105:1-105:13, ECF No. 21-11; Redford Dep. Ex.6, ECF No. 21-11.)

102.    Since June 2011, HFD has terminated the employment of three Firefighters due to on-duty misconduct. (Baxter Aff. ¶ 17, ECF No. 21-4.) In one instance, the Firefighter was terminated for failing a drug test, which results in automatic termination. (Baxter Aff. ¶ 18-20, ECF No. 21-4.) In the other two instances, the affected Captains recommended the termination of the Firefighters. (Baxter Aff. ¶¶ 19-21, ECF No. 21-4; *see also* Weymouth Dep. 65:22-75:3, ECF

---

[32] Plaintiffs essentially assert that Fact ¶ 100 is in dispute. (*See* Pls.' LDF ¶¶ 22.) The portions of the record cited by Plaintiffs do indicate that Captains lack unilateral authority to impose discipline; however, those portions challenge neither the statements in Baxter's affidavit that indicate that recommendations are sent up the chain of command in order to ensure fair and uniform discipline nor the proposition that Captains may be asked to impose discipline. (*Compare* Weymouth Dep. 78:5-19, ECF No. 24-2; Redford Dep. 62:12-16, ECF No. 24-3, *with* Baxter Aff. ¶ 14, ECF No. 21-4.) In other words, Plaintiffs' assertion that "fairness" is not the reason that Captains send recommendations for discipline up the chain of command is purely speculative. Accordingly, the Court finds that Fact ¶ 100 is not genuinely in dispute.

No. 21-9 (detailing Weymouth's investigation of misconduct and ultimate recommendation of termination).)[33]

**F. Defendant's Efforts to Comply with the FLSA**

103.   HFD's Department of Human Resources ("HR Department") conducted a 15-month review on the impact of the U.S. Department of Labor, Wage and Hour Division Rule "Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees." (Reid Aff. ¶¶ 21-22, ECF No. 21-2; Reid Aff. Ex. 2-H, ECF No. 21-3.)

104.   This review included an analysis of each position and the effects that DOL's new rule would have on employee, and Captain, classifications. (Reid Aff. ¶¶ 21-22, ECF No. 21-2; Reid Aff. Ex. 2-H, ECF No. 21-3.)

105.   The HR Department consulted publications and attended seminars on the First Responder Regulation, in addition to contacting other Virginia localities to see how the Regulation affected different employees. (Reid Aff. ¶¶ 21-23, ECF No. 21-2; Reid Aff. Exs. 2-H, 2-I, ECF No. 21-3.)

106.   The HR Department's files include a letter from the Department of Labor Wage and Hour Administrator to the Chairman of the Fairfax County Board of Supervisors, dated May 6, 2004, that stated that the final regulations conform to current case law that holds "that certain high-level public safety officials, such as [C]aptains and [C]hiefs, may meet the duties requirements for the executive or administrative exemption." (Reid Aff. ¶ 23, ECF No. 21-2; Reid Aff. Ex. 2-I, ECF No. 21-3.)

---

[33] Plaintiffs dispute the manner in which Defendant characterizes Weymouth's recommendation of termination. (*See* Pls.' LDF ¶ 26.) Plaintiffs correctly note that Weymouth initially recommended termination, but that HFD gave the employee a second chance. (*See* Weymouth Dep. 71:9-73:18, ECF No. 24-2.) Fact ¶ 102, however, is not genuinely in dispute because Plaintiffs recognize that Weymouth recommended termination and that HFD eventually agreed with her. (Pls.' LDF ¶ 26.)

107.    The HR Department's files also include an Opinion Letter from a law firm, dated September

29, 2004, opining that HFD's Captains were improperly classified as Exempt in light of the,

then-new, First Responder Regulation. (Reid Aff. Ex. 2-J ECF No. 21-3.)

108.    Following the review, The HR Department did not specifically conclude that Captains were

improperly classified as Exempt in light of the new regulations. (*See* Reid Aff. Ex. 2-H ECF

No. 21-3.)

109.    The HR Department conducted a review of the law firm's Opinion Letter, concluded that the

Captains' Exempt status was proper, and ultimately wrote a rebuttal, dated November 9, 2004,

that responded to every paragraph of the Opinion Letter. (Reid Aff. Exs. 2-K, 2-L ECF No. 21-

3.)

110.    The HR Department also sought advice from the Henrico County Attorney as to the status of

Captains. On December 22, 2004, the County Attorney's Office ultimately concluded that the

County had properly classified Captains as Exempt employees. (Reid Aff. Ex. 2-M at 5-7 ECF

No. 21-3.)

## II. PROCEDURAL POSTURE

Plaintiffs filed their Complaint on June 6, 2014. Defendant filed its answer on August 14,

2014. On September 30, 2014, the Court conditionally certified this case to proceed as a collective

action under 29 U.S.C. § 216(b).

On May 22, 2015, Defendant filed its Motion for Summary Judgment. On May 27, 2015,

Plaintiffs filed their Motion for Summary Judgment. On July 14, 2015, the Court heard oral

argument on the Parties' cross-motions for summary judgment.

## III. STANDARD OF REVIEW

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is

appropriate "if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry in a summary judgment analysis is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). In reviewing a motion for summary judgment, the Court must view the facts in the light most favorable to the non-moving party. *Id.* at 255.

When considering a case for summary judgment, the Court cannot weigh the evidence to enter a judgment, but simply must determine if a genuine issue exists for trial. *Greater Balt. Ctr. for Pregnancy Concerns v. Baltimore*, 721 F.3d 264, 283 (4th Cir. 2013) (quoting *Anderson*, 477 U.S. at 249). Once a motion for summary judgment is properly made and supported, the opposing party bears the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The mere allegation of a factual dispute does not suffice to defeat an otherwise properly supported motion for summary judgment; the requirement provides that no genuine issue of material fact exists. *Anderson*, 477 U.S. at 247-48.

A material fact is one that may affect the outcome of a party's case. *Id.*; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). Substantive law determines a fact's materiality, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *Hooven–Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir.2001) (citing *Anderson*, 477 U.S. at 248). Indeed, summary judgment must be granted if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

To defeat an otherwise properly supported motion for summary judgment, the non-moving party must rely on more than conclusory allegations, "mere speculation," the "building of one

32

inference upon another," the "mere existence of a scintilla of evidence," or the appearance of some "metaphysical doubt" concerning a material fact. *Lewis v. City of Va. Beach Sheriff's Office*, 409 F. Supp. 2d 696, 704 (E.D. Va. 2006) (citations omitted). A "genuine" issue concerning a "material" fact only arises when the evidence, viewed in the light most favorable to the non-moving party, sufficiently allows a reasonable jury to return a verdict in that party's favor. *Anderson*, 477 U.S. at 248. As the Supreme Court has explained, "this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48.

Because this matter comes before the Court on cross-motions for summary judgment, the Court must "review each motion separately on its own merits" and ensure that it "resolve[s] all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citations and internal quotation marks omitted).

## IV. ANALYSIS

The plain language of the FLSA mandates overtime pay for employees who work more than 40 hours per week, providing that

> no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half time the regular rate at which he is employed

("Overtime Requirement"). 29 U.S.C. § 207(a)(1). This Overtime Requirement is subject to certain exceptions, including an exception for workers who are "employed in a bona fide executive . . .

capacity;" that is, employers need not pay overtime wages to Executive Employees ("Executive Exemption"). 29 U.S.C. § 213(a)(1).

At issue in this case is whether Plaintiffs are subject to the Overtime Requirement or if the Executive Exemption applies to them; that is, whether Plaintiffs are "Non-Exempt" and entitled to overtime wages or "Exempt" and not entitled to overtime wages. The Department of Labor ("DOL") has promulgated regulations for use in determining whether the Executive Exemption applies to an employee. If an employer is able to demonstrate with clear and convincing evidence that an employee satisfies the four factors of the Executive Exemption Test, 29 C.F.R. § 541.100(a), then that employee is an "Exempt Executive" and is not entitled to overtime wages. *See Shockley v. City of Newport News*, 997 F.2d 18, 21 (4th Cir. 1993); *see also Jones v. Williams*, No. CCB-11-793, 2012 WL 4470239, at *4 (D. Md. Sep. 25, 2012) ("[a]n employer must show 'by clear and convincing evidence' that the employee's job is exempted, and the exemptions are to be 'narrowly construed against the employer[] . . . and limited to those establishments plainly and unmistakably' within their terms." (citing *Desmond v. PNGI Charles Town Gaming, LLC*, 564 F.3d 688, 691-92 (4th Cir. 2009))). One of the factors of the Executive Exemption Test is the "Primary Duty Test," a totality test used to determine an employee's "Primary Duty."

In the instant case, Plaintiffs argue that they are Non-Exempt employees because their primary duty is fighting fires and, thus, that they are not Exempt Executives within the meaning of the FLSA and relevant regulations. (*See* Pls.' Mem. Supp. at 1-2, 16-23; Tr. 3:16-18.) Moreover, Plaintiffs argue that the First Responder Regulation, 29 C.F.R. § 541.3, which DOL promulgated in 2004, is the lens through which the Court must undertake its Primary Duty analysis. (*See* Tr. 11:6-16.)

Defendant, to the contrary, argues that Plaintiffs are Exempt because they meet the statutory and regulatory definition of Exempt Executives. (*See* Defs.' Mem. Supp. at 16-26.) Moreover,

Defendant argues that the First Responder Regulation plays no part in the Executive Exemption analysis in this case, because Defendant can prove Plaintiffs are Exempt without considering any management that Plaintiffs perform "in the field." (*See* Tr. 28:2-14.) Defendant also argues that, should its Motion for Summary Judgment be denied or Plaintiffs' Motion be granted, damages should be limited to two years and Plaintiffs should not receive liquidated damages. (*See* Def.'s Mem. Supp. at 26-30.)[34] For the reasons discussed below, the Court agrees with Defendant.

## A. There are no Material Facts in Dispute and Disposition via Summary Judgment is Appropriate

The Supreme Court has recognized that Exemption determinations under the FLSA raise questions of both law and fact. "The question of how [employees] spen[d] their working time . . . is a question of fact. The question whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law . . . ." *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986). Moreover, the Fourth Circuit has held that "[t]he determination of whether an employee falls within the scope of a FLSA exemption is ultimately a legal question." *Walton v. Greenbrier Ford, Inc.*, 370 F.3d 446, 450 (4th Cir. 2004); *cf. Maestas v. Day & Zimmerman, LLC*, 664 F.3d 822, 829 (10th Cir. 2012) ("Because the primary duty determination is a factual one, summary judgment is appropriate only if all reasonable factfinders would conclude that the managerial portions of plaintiffs' jobs are their 'primary duties.' [The Employer] bears the burden of producing evidence that 'plainly and unmistakably' shows that its position is correct.")

Summary judgment, of course, is available only when there are no genuine disputes as to any material facts. Fed. R. Civ. P. 56(a); *see Anderson*, 477 U.S. at 251-52. Indeed, the Court notes that FLSA Exemption cases are often not decided on summary judgment, due to the fact-intensive

---

[34] Plaintiffs argue against Defendant's position on damages. (*See* Pls.' Resp. at 28-30.) Plaintiffs, however, do not raise their own damages argument in their Motion for Summary Judgment. (*See* Pls.' Mot. Summ. J., ECF No. 22; Pls.' Mem. Supp., ECF No. 23.)

nature of the inquiry. *See, e.g., Maestas*, 664 F.3d at 827-30 (affirming in part and reversing in part the district court's grant of summary judgment). Nonetheless, courts have recognized that summary judgment is appropriate where there are no genuine disputes as to any material facts, and "it is clear that [an employee's] managerial duties are primary." *Maestas*, 664 F.2d at 831 (affirming summary judgment ruling that found a police major to be an Exempt Executive); *see Rooney v. Town of Groton*, 577 F. Supp. 2d 513, 531 (D. Mass. 2008) (ruling on summary judgment that a police lieutenant was an Exempt Executive); *see also Morrison v. County of Fairfax*, No. 1:14-CV-005, 2014 WL 5591073 (E.D. Va. Nov. 3, 2014) (ruling on summary judgment that fire department captains were Exempt Executives).[35]

In the instant case, as noted above in the Background section, Plaintiffs argue that several facts are in dispute. (Pls.' Resp. at 3-8.) Defendant alleges that there are no genuine disputes as to any material facts in this action. (*See* at Def.'s Mem. Supp. at 6-15; Def.'s Resp. at 2-3; *see also* Def.'s Reply at 5.) Defendant has alleged that Plaintiffs' listing of disputed facts, (Pls.' Resp. at 3-8), and listing of undisputed facts, (Pls.' Mem. Supp. at 2-13), do not accurately reflect the facts in the record. The Court agrees with Defendant.

As discussed in the footnotes of the Background Section herein, the purported disputed facts are either not actually in dispute or do not present material disputes that would affect the disposition of this case. The parties strenuously dispute the characterization of the facts and their legal import; however, the underlying material facts themselves are not actually in dispute. Plaintiffs understandably characterize their work differently than Defendant does and draw very different conclusions from the facts. While these disputed characterizations and conclusions appear facially to be factual, they are in essence, legal. The exemption analysis may be factually driven; however,

---

[35] *Morrison* is currently on appeal before the United States Court of Appeals for the Fourth Circuit and has been assigned Case Number 14-2308.

if those facts are not in dispute, summary judgment is appropriate as the Fourth Circuit has explicitly instructed that "[t]he determination of whether an employee falls within the scope of a FLSA exemption is ultimately a legal question." *Walton*, 370 F.3d at 450 (upholding summary judgment ruling finding that employee was exempt from an FLSA overtime requirement).

Accordingly, having reviewed the record and Defendant's listing of undisputed facts, Plaintiffs' listing of disputed facts, and Plaintiffs' listing of undisputed facts, the Court finds that there are no genuine disputes as to any material facts and thus disposition via summary judgment is appropriate. *See, e.g., Roberts v. Cowan Distribution Services, LLC*, 58 F. Supp. 3d 593, 605 (E.D. Va. 2014) ("[S]hould the parties not dispute how employees spend their time working, summary judgment warrants determination of the question of law—namely whether Plaintiffs are entitled to overtime compensation.")

## B. The Executive Exemption Test, the Primary Duty Test, and the First Responder Regulation

The Overtime Requirement is subject to certain exceptions, including for workers who are "employed in a bona fide executive . . . capacity." 29 U.S.C. § 213(a)(1). The Executive Exemption Test, Primary Duty Test, and First Responder Regulation are relevant in determining whether an employee is an Exempt Executive.

### 1. Executive Exemption Test

According to the regulations, an Exempt Executive is an employee who is:

> **(1)** Compensated on a salary basis at a rate of not less than $ 455 per week . . .;
>
> **(2)** Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
>
> **(3)** Who customarily and regularly directs the work of two or more other employees; and

37

> **(4)** Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight

("Executive Exemption Test"). 29 C.F.R. § 541.100(a); *see Mullins v. City of New York*, 653 F.3d 104, 106-08 (2nd Cir. 2011) (discussing the Executive Exemption Test, the Primary Duty Test, and First Responder Regulation). An employer must demonstrate, with clear and convincing evidence, that an employee meets all four of the above factors in order to classify that employee as an Exempt Executive. *Shockley*, 997 F.2d at 21. The second factor, the "Primary Duty Test," is the subject of its own regulation.

## 2. Primary Duty Test

For an employee to be considered an Exempt Executive, the Executive Exemption Test requires that the employee's "primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof." 29 C.F.R. § 541.100(a)(2). "To qualify for the [Executive Exemption], an employee's 'primary duty' must be the performance of exempt work." 29 C.F.R. § 541.700(a). The regulation goes on to define primary duty as "the principal, main, major or most important duty the employee performs." *Id.* In determining whether the performance of particular work functions is an employee's primary duty, courts must make their analyses "based on all the facts in a particular case, with major emphasis on the character of the employee's job as a whole." *Id.*

> Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee

("Primary Duty Test"). *Id.* If an employer can demonstrate through clear and convincing evidence

that an employee's primary duty is management, *see Shockley*, 997 F.2d at 21, the employee

satisfies the second factor of the Executive Exemption Test.

### i. Exempt Management Duties

One of the factors to be weighed when determining an employee's primary duty is that of

"the relative importance of the exempt duties as compared with other types of duties." 29 C.F.R.

§ 541.700(a). The Regulations provide several examples of activities that are generally considered

to be Exempt management work. For purposes of determining whether an employee's Primary

Duty is exempt executive management, the Regulations state that

> Generally, "management" includes, but is not limited to, activities
> such as interviewing, selecting, training of employees; setting and
> adjusting their rates of pay and hours of work; directing the work of
> employees; maintaining production or sales records for use in
> supervision or control; appraising employees' productivity and
> efficiency for the purpose of recommending promotions or other
> changes in status; handling employee complaints and grievances;
> disciplining employees; planning the work; determining the
> techniques to be used; apportioning the work among the employees;
> determining the type of materials, supplies, machinery, equipment or
> tools to be used or merchandise to be bought, stocked and sold;
> controlling the flow and distribution of materials or merchandise and
> supplies; providing for the safety and security of the employees or the
> property; planning and controlling the budget; and monitoring or
> implementing legal compliance measures.

29 C.F.R. § 541.102. These management activities provide a useful guide, but are not dispositive,

for proving that an employee's primary duty is management. Moreover, given that the Primary

Duty Test itself is a totality test, *see Maestas*, 664 F.3d at 827 (discussing the weighing of Primary

Duty Test factors), the mere performance or non-performance of Exempt work as described in

Section 541.102 is indicative, but not solely dispositive, of an employee's primary duty.

### 3. First Responder Regulation

The "First Responder Regulation," promulgated in 2004, states in relevant part that

> [The Executive Exemption] do[es] not apply to . . . fire fighters . . .
> regardless of rank or pay level, who perform work such as preventing,
> controlling or extinguishing fires of any type; rescuing fire . . . or
> accident victims; . . . or other similar work.

29 C.F.R. § 541.3(b)(1).  In providing that the Executive Exemption does not apply to first

responders, regardless of rank or pay, who perform first responder work functions, the First

Responder Regulation goes on to state that

> [s]uch employees do not qualify as exempt executive employees
> because their primary duty is not management of the enterprise in
> which the employee is employed or a customarily recognized
> department or subdivision thereof as required under § 541.100. Thus,
> for example, a police officer or firefighter whose primary duty is to
> investigate crimes or fight fires is not exempt under section 13(a)(1)
> of the Act merely because the police officer or fire fighter also directs
> the work of other employees in the conduct of an investigation or
> fighting a fire.

29 C.F.R. § 541.3(b)(2).  The Fourth Circuit has not yet addressed the interplay among the First

Responder Regulation, the Executive Exemption Test, and the Primary Duty Test.  The Tenth

Circuit, however, has done so and has explicitly held that "[t]he first responder regulation does not

alter the primary duty test." *Maestas*, 664 F.3d at 827.  This Court agrees.

While Section (b)(1) of the First Responder Regulation would seem to mandate overtime

pay for all individuals who fight fires, Section (b)(2) clarifies and restricts the seemingly broad

scope of Section (b)(1).  By its explicit language, Section (b)(2) clarifies that the standard Primary

Duty and Executive Exemption Tests are still dispositive of Exemption status.  In other words,

Section (b)(2) clarifies that the First Responder Regulation is not an ultimate "trump card" to the

finding that an employee who performs first responder work is an Exempt Executive.  That is,

Section (b)(2) indicates that the First Responder Regulation only applies to 'fire fighters who

manage in the field,' not to all employees in the fire department, regardless of rank.  The purpose of

the First Responder Regulation is to ensure that 'line' first responders—whose Primary Duty is to

respond to emergency calls—cannot be considered as Exempt Executives simply because they

"direct[] the work of other employees in the conduct of an investigation or fighting a fire." 29

C.F.R. § 541.3(b)(2). "In other words, although 'directing the work of employees' is normally a

managerial duty, it is not a managerial duty when it is performed concurrently with front-line law

enforcement work." *Maestas*, 664 F.3d at 829.

This analysis accords with that of the Second Circuit which, after having invited DOL to

appear as *amicus curiae*, ultimately found DOL's interpretation of the First Responder Regulation

to be controlling and thereby also found that "when first responders direct the work of subordinate

officers while performing the types of law enforcement duties enumerated in section 541.3(b)(1),

such supervision does not constitute management that, in applying the primary duties test, would

satisfy the second prong of executive exemption." *See Mullins*, 653 F.3d at 110, 117. Even

considering the First Responder Regulation, when analyzing whether employees are Exempt, "the

determining factor remains their primary duty." *Id.* at 110 (citing Brief for United States Dep't of

Labor as *Amicus Curiae* at 5).

In short, the Court finds that the First Responder Regulation does not alter the Executive

Exemption Test or the Primary Duty Test. This is not to say that the First Responder Regulation

has no impact whatsoever on these tests. Indeed, the First Responder Regulation does affect the

Primary Duty Test by effectively removing certain work activities from the primary duty analysis.

That is, if a first responder can only be considered an Exempt Executive because of management

work performed "in the field," the First Responder Regulation renders that employee Non-Exempt.

*See Maestas*, 664 F.3d at 829. However, if an employee satisfies the four factors of the Executive

Exemption Test, including the Primary Duty Test—as demonstrated solely by work activities

outside of fighting fires—that employee is an Exempt Executive.

In other words, if Defendant can demonstrate by clear and convincing evidence that

Plaintiffs are Exempt Executives under these two tests, without citing any of Plaintiffs work "in the

field" as evidence, Plaintiffs are Exempt Executives.  If, however, Plaintiffs would only be Exempt under these tests when considering management work done "in the conduct of . . . fighting a fire," they are Non-Exempt.

## C. Analysis in the Instant Case

Having discussed the interplay among the relevant statutes and regulations at issue, the Court turns to the application of the undisputed facts of record to the Executive Exemption Test. For the reasons discussed below, the Court finds that Defendant has demonstrated by clear and convincing evidence that Plaintiffs satisfy all four factors of the Executive Exemption Test. Accordingly, the Court finds that Plaintiffs are Exempt Executives and are not entitled to overtime compensation.

### 1. Executive Exemption Test

As discussed below, the Court finds that Defendant, through the use of undisputed facts, has shown by clear and convincing evidence—as a matter of law—that Plaintiffs satisfy all four factors of the Executive Exemption Test. *See Walton*, 370 F.3d at 450 ("The determination of whether an employee falls within the scope of a FLSA exemption is ultimately a legal question."). Accordingly, the Court finds that Plaintiffs are Exempt Executives.

#### i. Plaintiffs are Compensated on a Salary Basis of at least $455 per Week

To satisfy the first factor of the Executive Exemption Test, Defendant must prove that Plaintiffs are or were "[c]ompensated on a salary basis at a rate of not less than $455 per week." 29 C.F.R. § 541.100(a)(1).

The undisputed facts in the record indicate that Captains are compensated at salary grade 33, without regard to the number of hours that they actually work. (Fact ¶¶ 46-47.) Moreover, each Plaintiff testified that he or she was paid more than $455 per week while serving as a Captain. (Fact

¶ 47.)  Accordingly, Defendant has proven that Plaintiffs satisfy the first factor of the Executive

Exemption Test.

### ii.  Plaintiffs' Primary Duty is Management of their Fire Stations

To satisfy the second factor of the Executive Exemption Test, Defendant must prove that

Plaintiffs' "primary duty is management of the enterprise in which the employee is employed or of

a customarily recognized department or subdivision thereof."  29 U.S.C. § 541.100(a)(2).  In

Henrico County, Captains manage fire stations.  (*See, e.g.*, Fact ¶¶ 14, 48-50, 68.)  The Fourth

Circuit has held that "[a] station or a shift constitutes a recognized department or subdivision of the

Fire Department and is comprised of many more than the regulatory minimum of 'two or more

other employees.'"  *West v. Anne Arundel County, Md.*, 137 F.3d 752, 763 (4th Cir. 1998).

Therefore, if Plaintiffs' primary duty is the management of their fire stations, they satisfy the second

factor of the Executive Exemption Test.  For the reasons discussed below, the Court finds that

Plaintiffs' primary duty is the management of their fire stations.

"To qualify for the [Executive Exemption], an employee's 'primary duty' must be the

performance of exempt work."  29 C.F.R. § 541.700(a).  In evaluating an employee's primary duty,

particular factors to consider include

> the relative importance of the exempt duties as compared with other
> types of duties; the amount of time spent performing exempt work;
> the employee's relative freedom from direct supervision; and the
> relationship between the employee's salary and the wages paid to
> other employees for the kind of nonexempt work performed by the
> employee.

*Id.*  No single factor is dispositive, as the Primary Duty Test is a totality test, and an analysis must

be "based on all the facts of a particular case, with major emphasis on the character of the

employee's job as a whole."  *See id.*; *see also Mullins*, 653 F.3d at 106-07.  For example, regarding

the "time spent" factor, the Tenth Circuit has noted that "[t]ime spent performing each duty is a

'useful guide' in examining which duty is primary, but there is no requirement that an exempt

43

executive employee spend more than half her time on managerial tasks." *Maestas*, 664 F.3d at 827.

Per the regulations, exempt management duties include, but are not limited to, activities such as

making employment decisions, directing the work of employees, apportioning work among

employees, training employees, evaluating employees, disciplining employees, providing for

employee safety, planning and controlling the budget, and ensuring legal compliance measures. *See*

29 C.F.R. § 541.102. The Court also notes that, while 'discretion' is not an explicit factor of the

Primary Duty Test, "freedom from direct supervision" and the types of exempt management duties

listed in the regulations clearly contemplate that an employee whose primary duty is management

has certain discretion that Non-Exempt employees do not. *Cf. Maestas*, 664 F.3d at 831 (finding

that a police major was an Exempt Executive, in part, because he "enjoy[ed] a greater degree of

independence and discretion than the subordinate officers").

### a. Plaintiffs' Non-Exempt Work

Before turning to an evaluation of Plaintiffs' Exempt management work, the Court notes

that Plaintiffs perform Non-Exempt work and respond to emergency calls in the field. (*See, e.g.*,

Fact ¶¶ 17-26.)

Captains conduct Daily Checks of their personal and their particular station's apparatus and

equipment. (Fact ¶ 13.) Captains also perform housework and other manual labor around their

Stations. (Fact ¶ 15-16.) Captains, however, "are not required to perform manual jobs around the

station," and they have discretion as to whether or not they engage in "daily apparatus and station

cleaning and maintenance duties." (Fact ¶ 17 (quoting McDowell Aff. ¶ 30, ECF No. 21-1); *see*

*also* Fact ¶ 56.) Indeed, Captains' involvement in housework "depend[s] entirely on the day," and

their involvement ranges "from one end of the spectrum, no involvement at all, to the other end of

the spectrum, to participating in all of the other activities." (Fact ¶ 18 (quoting Baxter Dep. 53:13-

19, ECF No. 24-6).) Furthermore, as Captains, Plaintiffs were in a "unique role" to choose whether

they performed housework and other manual labor in order to "lead by example." (Fact ¶ 19

(quoting Baxter Dep. 53:25-54:4; 100:20-25, ECF No. 21-13).) Moreover, while Captains may

choose to perform Non-Exempt work, they remain at all times responsible for their supervisory and

command duties. (*See* Fact ¶ 17.) While this manual work is Non-Exempt, the Court notes that

Captains had the discretion whether or not to perform it and that, under the regulations, Exempt

Executives "[g]enerally . . . make the decision regarding when to perform nonexempt duties and

remain responsible for the success or failure of . . . operations under their management while

performing the nonexempt work." 29 C.F.R. § 541.106(a); *see also Masters v. City of Huntington*,

800 F. Supp. 363, 366 (S.D.W.V. 1992) (finding that fire captains who perform housework were

Exempt Executives, because "while performing such work they are not thereby relieved of their

obligation to supervise those employees nor is the fact of their command of the station house

affected"); *Harkins v. City of Chesapeake*, No. 88-254-N, 1988 WL 235927, at *10 (E.D. Va. Dec.

2, 1988) (finding a Captain, who chose to engage in manual work out of managerial discretion "to

build up good spirit," to be exempt).

As for emergency calls, it is undisputed that Captains are part of the minimum staffing for

fire engines and generally must respond to emergency calls when they are actually assigned to an

engine. (*See* Fact ¶¶ 21, 24-26.) Captains, however, also possess the ability to remove themselves

from an engine, so long as minimum staffing is otherwise maintained. (Fact ¶ 25.) Moreover,

Captains even have the "broad discretion" to choose not to respond to calls, even if minimum

staffing is not maintained. (Fact ¶ 26 (quoting McDowell Dep. 89:3-18, ECF No. 21-18) (Baxter

testified to the same, although he noted that it would be unusual to not maintain minimum staffing,

*see* Fact ¶ 26 (quoting Baxter Dep. 96:17-97:14, ECF No. 21-13)).) Regardless of their discretion

in responding to emergency calls, adhering to the First Responder Regulation, the Court notes that

any work that Plaintiffs perform in the field is considered non-managerial and Non-Exempt. *See, e.g.*, *Maestas*, 664 F.3d at 828-29.

While time spent on Exempt versus Non-Exempt work is not dispositive of exemption status, *see id.* at 827, it is also undisputed that the busiest station in Henrico County only spent ten percent of its time responding to emergency calls from June 2013 to May 2014. (Fact ¶ 59.) Moreover, HFD has calculated that, from January 1, 2011 to March 31, 2015, Plaintiffs themselves only spent two to three percent of their on-duty time responding to emergency calls. (Fact ¶ 59.)[36]

While Plaintiffs undisputedly performed Non-Exempt work in addition to their Exempt work, these facts—in themselves—cannot render Plaintiffs' Exemption status invalid. Indeed, the regulations specifically state that "[c]oncurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption if the requirements of [the Executive Exemption Test] are otherwise met." 29 C.F.R. § 541.106(a). Accordingly, the Court continues by analyzing whether the record demonstrates by clear and convincing evidence that Plaintiffs' primary duty is management.

### b. Plaintiffs' Management Functions

In the instant case, the record demonstrates that Captains make recommendations as to employment decisions, (*see, e.g.*, Fact ¶¶ 77-89); direct and supervise the work of other HFD employees (*see, e.g.*, Fact ¶¶ 14, 48-50, 68-70); train other employees (*see, e.g.*, Fact ¶¶ 70-71, 93-94); evaluate other employees (*see, e.g.*, Fact ¶¶ 90-92); assist with budget development (*see, e.g.*,

---

[36] While HFD records indicate that Plaintiffs themselves only spent two to three percent of on-duty time responding to emergency calls, (Fact ¶ 59), the Court notes that these records do not indicate that the remaining ninety-seven percent of Plaintiffs' on-duty time is spent performing management functions. Indeed, during oral argument on the cross-motions for summary judgment, Defendant did not suggest that Plaintiffs spend the balance of their time performing management functions. (*See* Tr. 33:11-35:11.) Nonetheless, the record clearly demonstrates that Plaintiffs do not spend a majority of their on-duty time responding to emergency calls. (*See* Fact ¶ 59.) Regardless, the Court reiterates that the amount of time an employee spends performing Exempt versus Non-Exempt work is not, alone, dispositive of exemption status. *See Maestas*, 664 F.3d at 827.

Fact ¶¶ 51-52); enjoy relative freedom from direct supervision (*see, e.g.*, Fact ¶¶ 63-67); exercise

discretion in various activities (*see, e.g.*, Fact ¶¶ 14, 17-19, 25-26); are able to delegate work, (*see,*

*e.g.*, Fact ¶ 14, 51); and, are ultimately responsible for the personnel and equipment at their stations,

(*see, e.g.*, Fact ¶¶ 49, 60). Having reviewed the undisputed facts of the record, the Court, as a

matter of law, *see Walton*, 370 F.3d at 450, finds that Plaintiffs' primary duty is management of

their fire stations.

The Court first notes that Captains are compensated at a higher grade than Lieutenants and

Firefighters. (*See* Fact ¶¶ 44-46.) Captains also have more responsibilities than Lieutenants and

Firefighters. (*See, e.g.*, Fact ¶ 60 ("They do everything that [Lieutenants] do, but they just get more

put on their plate." (quoting Deaver Dep. 75:19-76:6, ECF No. 21-15).)

Indeed, Plaintiffs—as Captains—performed many of the exempt management duties

enumerated in 29 C.F.R. § 541.102. Captains are involved in the process of interviewing new

employees. Specifically, Captains have the opportunity to sit on interview panels for new-hire

candidates. (Fact ¶ 88.) Indeed, Redford actually sat on a hiring interview panel. (Fact ¶ 89.) Of

the twelve candidates that the panel recommended be hired, HFD hired eleven, with the twelfth

declining to accept the position. (Fact ¶ 89.) Captains also have the opportunity to sit on

promotional panels, and, as discussed more fully below, their recommendations are frequently

followed. (*See* Fact ¶¶ 75-87; *infra* Section IV.C.1.iv.)

Captains are also involved in the training of the employees at their stations. While

Lieutenants typically determine the training needed for their particular shift, Captains have the

authority to direct Lieutenants to focus on particular areas of training. (Fact ¶ 43.) HFD holds

Captains responsible for developing performance improvement plans and ensuring that their

Lieutenants implement the plans. (Fact ¶¶ 93-94.) Indeed, Captains are ultimately responsibility

for ensuring that all personnel in their station, across all three shifts, are satisfactorily completing their training. (Fact ¶ 71 & n.24.)

Captains also evaluate their subordinates. Captains conduct annual performance appraisals of their Lieutenants, in addition to reviewing their Lieutenants' appraisals of Firefighters. (Fact ¶¶ 90-91.) Moreover, while Lieutenants typically perform the appraisals of Firefighters, Captains have the authority to reject or modify those appraisals. (Fact ¶ 91.) Indeed, HFD holds Captains responsible for addressing deficiencies in their subordinates' performance and developing improvement plans for their Lieutenants to implement. (Fact ¶¶ 92-94.)

HFD also relies on Captains "to identify and take steps to address potential infractions committed by personnel assigned to their stations." (Fact ¶ 96 (quoting Baxter Aff. ¶ 10, ECF No. 21-4).) HFD further relies on Captains to address minor issues "outside the formal disciplinary process." (Fact ¶ 97 (quoting Baxter Aff. ¶ 13, ECF No. 21-4).) For example, Captains may impose oral counselings, without approval from superior officers. (Fact ¶ 97.) To ensure fairness and uniformity of discipline, individual Captains lack the unilateral authority to impose discipline for more severe infractions. (Fact ¶¶ 98-100.) Captains, however, are expected to recommend disciplinary measures up the chain of command. (Fact ¶¶ 98-100.) For example, Redford once recommended that a habitually late Firefighter be issued a written reprimand, and HFD ultimately directed Redford to issue the reprimand. (Fact ¶ 101.) Importantly, Redford exercised discretion in only recommending a written reprimand, as "[o]rdinarily, the discipline would have been more severe." (Fact ¶ 101 (quoting Redford Dep. 103:4-105:3, ECF No. 21-11).) Furthermore, as discussed in more detail below, Captains will recommend discipline in the form of termination, and HFD frequently follows such recommendations. (*See* Fact ¶¶ 101-102; *infra* Section IV.C.1.iv.)

Captains are also ultimately responsible for developing, reviewing, and forwarding up the chain of command, budgets for specialty shops that operate out of their stations. (Fact ¶ 51.) While

Captains may delegate the actual development of the budget to their subordinates, Captains remain ultimately responsible for ensuring that budgets are developed and that their shops stay within budget. (Fact ¶ 51.)  Indeed, HFD holds Captains responsible if they fail to ensure the timely completion and submission of their budget. (Fact ¶ 52.)

Captains also enjoy relative freedom from direct supervision.  Captains report to Battalion Chiefs and District Chiefs, who work on different shifts from those the Captains work. (Fact ¶ 64.) "Battalion and District Chiefs leave the day-to-day management of a station to the Fire Captains." (Fact ¶ 63 (quoting McDowell Aff. ¶ 33, ECF No. 21-1).)  Indeed, due to their different shifts, Captains and their supervisors have overlapping schedules on only one-third of their on-duty days. (Fact ¶ 65.)  Moreover, Battalion Chiefs each supervise a number of stations and move among them on a daily basis. (Fact ¶ 66.)  As a result, Chiefs do not "shadow" their Captains or constantly "look over their shoulders." (Fact ¶ 67 (citations omitted).)  For example, Weymouth testified that "the majority of the time," she may only see a Battalion Chief about "three to four times" in a given month. (Fact ¶ 67 (quoting Weymouth Dep. 53:15-54:7, ECF No. 21-9).)

Finally, the record unequivocally demonstrates that Captains are ultimately responsible for the operation of their stations. (*See, e.g.*, Fact ¶ 14.)  According to the County's description of a Captain's job, a Captain "directs the activities of an assigned station." (Fact ¶ 8 (quoting Reid Aff., Ex. 2-A, ECF No. 21-3).)  Captains direct the work at their stations, apportion work among the shifts at their stations and ensure that the shifts satisfactorily complete their work. (*See* Fact ¶¶ 28-29, 68-70.)  HFD also expects Captains to act as the single point of command, communication, and oversight at their stations. (Fact ¶ 48.)  Indeed, even when Lieutenants act as the officer in charge, there are still "just a couple things that they can't do that [the Captain] simply could do." (Fact ¶ 48 (quoting Hughes Dep. 36:11-16, ECF No. 24-1).)  In acting as the point of command for their stations, Captains ensure that their stations and subordinates act in compliance with applicable HFD

policies, Henrico County rules and regulations, and operational protocols. (Fact ¶ 50.) Captains also ensure that their shift supervisors complete their operation reports in a timely fashion, and Battalion Chiefs hold Captains responsible if the reports are not completed. (Fact ¶ 62.) HFD also relies on Captains to oversee special, one-time projects. (Fact ¶ 54.) For example, Weymouth oversaw a project tasked with coordinating search and rescue procedures with the police department and Hughes served as the liaison for legislative initiatives to the Virginia General Assembly. (Fact ¶ 54; *see also* Fact ¶ 53 (discussing Captains' role in station construction projects).)

Furthermore, "HFD relies on its Captains to ensure the operational readiness of the personnel and equipment assigned to each station." (Fact ¶ 49 (quoting McDowell Aff. ¶ 9, ECF No. 21-1).) Indeed, Captains even have the authority to divert emergency calls to other stations "based on their professional judgment and in consideration of factors . . . associated with the call." (Fact ¶ 58 (quoting McDowell Aff. ¶ 27, ECF No. 21-1).) Ultimately, a Captain's responsibility was well summarized by Lieutenant Deaver when he testified that

> Well, he is responsible for the whole station. He is responsible for the station, the inventory, everything within that station, the apparatus, everything, he is responsible. He is ultimately responsible for the performance of his lieutenants and also he is ultimately responsible for the performance of the firefighters. In addition to that, whatever projects that may be delegated from fire administration, they have to full that obligation. . . . They do everything that I do, but they just get more put on their plate.

(Fact ¶ 90 (quoting Deaver Dep. 75:19-76:6, ECF No. 21-15).)

As a final note, the Court reiterates its finding that the First Responder Regulation "does not alter the Primary Duty Test." *Maestas*, 664 F.3d at 827; *see supra* Section IV.B.3. The First Responder Regulation does not supplant the Primary Duty Analysis, but rather merely directs that supervision on the scene of an emergency "does not constitute management that, in applying the primary duties test, would satisfy the second prong of executive exemption." *Mullins*, 653 F.3d at

110. Accordingly, in performing its primary duty analysis, the Court has not considered any management work performed by Captains "in the field."

Based on the foregoing analysis, the totality of the facts of this case invariably leads the Court to the conclusion that, as Captains, Plaintiffs' primary duty is management of their fire stations. Captains spend relatively little time performing emergency response work. (*See* Fact ¶ 59.) Captains also have the ultimate discretion as to whether or not they actually perform general Non-Exempt work or emergency response work. (*See, e.g.*, Fact ¶¶ 14, 17-19, 25-26, 58.) Captains do not, however, have the same discretion over their managerial work. (*See, e.g.*, Fact ¶ 49 (citing McDowell Aff. ¶ 10, ECF No. 21-1 ("While Captains have the discretion to delegate some of their job duties (such as developing a budget), the Captains remain ultimately responsible for those duties and for the activities and personnel at their station.").) Captains may delegate work to their subordinates; however, HFD expects Captains to complete their managerial duties and holds Captains accountable if they fail to perform them. (*See, e.g.*, Fact ¶ 49.) Captains are also ultimately held responsible for the supervision, operation, and direction of their stations. (*See e.g.*, Fact ¶¶ 49, 52, 60, 62, 71, 92-94.) Accordingly, the Court finds that the record shows that Plaintiffs' Primary Duty is the management of their fire stations and, thus, that Defendant has proven that Plaintiffs satisfy the second factor of the Executive Exemption Test.

### iii. Plaintiffs Regularly Direct the Work of Two or More Other Employees

To satisfy the third factor of the Executive Exemption Test, Defendant must prove that Plaintiffs "customarily and regularly direct[(ed)] the work of two or more other employees" 29 C.F.R. § 541.100(a)(3).

HFD expects Captains to direct the work of all personnel assigned to their stations, across all three of their stations' shifts. (Fact ¶ 69.) Indeed Plaintiffs have testified that, while serving as Captains, they supervised the three shifts assigned to their stations. (Fact ¶ 68.) These shifts

typically consisted of between one and two Lieutenants and three to seven firefighters.  (Fact ¶ 68.)

While Captains work directly with their Firefighters and Lieutenants, (Fact ¶ 61), they specifically

"provide direction and supervision" to their shift Lieutenants, of which there are at least three (Fact

¶ 70).  Moreover, with the permission of the affected Battalion or District Chief, a Captain may

internally transfer individuals among the shifts at the station.  (Fact ¶ 73.)  Accordingly, Defendant

has proven that Plaintiffs "customarily and regularly direct the work of two or more employees," 29

C.F.R. § 541.100(a)(3), thus satisfying the third factor of the Executive Exemption Test.

### iv. Plaintiffs' Suggestions and Recommendations as to Employment Decisions are Given Particular Weight

The final requirement of the Executive Exemption Test is that the employee be one "who

has the authority to hire or fire other employees or whose suggestions and recommendations as to

the hiring, firing, advancement, promotion or any other change of status of other employees

[("Employment Decisions")] are given particular weight" ("Employment Decisions Factor").  29

C.F.R. § 541.100(a)(4).

When DOL amended the relevant regulations in 2004, it noted that some fire department

employees who, prior to the amendments, were Exempt Executives could possibly no longer be

considered Exempt due to the added Employment Decisions Factor.  69 Fed. Reg. 22,122-01,

22,130 n. 8.[37]  However, citing concerns from employers, especially public sector employers who

---

[37] Prior to August 2004, there were two tests used to determine an employee's Executive Exemption status: the "short test" and the "long test." *See Mullins*, 653 F.3d at 106 n. 1.  The short test, which is most similar to the present incarnation of the Executive Capacity test, *compare* 29 C.F.R. § 541.1(f) (2003), *with* 29 C.F.R. § 541.100(a) (2004); *see also Mullins*, 653 F.3d at 106 (discussing the "short test"), was used for employees who earned more than $250/week and did not include the Employment Decisions Factor.  The "long test," used for employees who earned less than $250/week included the Employment Decisions Factor.  *See* 29 C.F.R. § 541.1(a)-(e) (2003).  As part of the 2004 revisions to the FLSA Regulations, DOL combined the "short test" and the "long test" into the current Executive Capacity Test.  *See Mullins* 653 F.3d at 106 & n. 1; *see also* 69 Fed. Reg. 22,122-01, 22,127.  In so doing, DOL incorporated the Employment Decisions Factor into the current Executive Capacity Test.  *See* 69 Fed. Reg. 22,122-01, 22,127

often vest the power to hire and fire with a single individual or board, DOL specifically noted that an employee need not have the actual ability to make employment decisions, but that the employee could satisfy the factor nonetheless if his recommendations as to employment decisions were given "particular weight." *See* 69 Fed. Reg. 22,122-01, 22,131; 29 C.F.R. § 541.100(a)(4). Furthermore, DOL promulgated a regulation that defined the term "particular weight." *See* 29 C.F.R. § 541.105.

According to the regulations, in determining whether an employee's employment recommendations are given particular weight,

> factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon. . . . It does not include an occasional suggestion with regard to the change in status of a co-worker. An employee's suggestions and recommendations may still be deemed to have "particular weight" even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status.

29 C.F.R. § 541.105. Furthermore, under the Executive Exemption Test, "[i]t is not necessary for the exempt employee to play a role in every single hire, fire, or promotion." *Rooney*, 577 F. Supp. 2d at 531-32 (ruling on summary judgment that a police lieutenant was an Exempt Executive); *see also Murphy v. Town of Natick*, 516 F. Supp. 2d 153, 160 (D. Mass. 2007) (noting that certain police officers who, under the civil service system, lack the ultimate authority to hire or fire employees are nonetheless Exempt Executives because they "play an influential role in the process by evaluating and interviewing" candidates for hire and promotion).

---

("[DOL's] final 'standard' duties test for the executive exemption incorporates the 'authority to hire or fire' requirement from the existing long test.").

In short, there are two ways through which an employee can satisfy this factor: (1) he possesses the actual authority to hire or fire other employees, or (2) his suggestions and recommendations as to Employment Decisions are given particular weight. In the instant case, it is undisputed that the Fire Chief is the only individual in HFD who has the actual authority to make the relevant Employment Decisions. (*See* Fact ¶ 74.) The Court finds, however, that Defendant has proven that Plaintiffs' recommendations as to Employment Decisions are given particular weight and, therefore, that Plaintiffs satisfy the fourth factor of the Executive Exemption Test.

Before he makes a promotion, the Fire Chief personally meets with a promotional interview panel and considers the recommendations of its individual members. (Fact ¶¶ 75-76.) Firefighters and Lieutenants are ineligible to sit on interview panels for promotions from Firefighter to Lieutenant. (Fact ¶ 77.) Captains, however, are able to, and do in fact, sit on promotional interview panels. (Fact ¶ 78.) Captains' involvement on promotional interview panels is "on a voluntary basis." (*See* Fact ¶ 78 & Footnote 26 (quoting Redford Dep. 55:24-56:9, ECF No. 21-11).) While Hughes, Redford, and Spencer have not sat on a promotional interview panel, Weymouth has done so several times. (Fact ¶¶ 79-80, 84-87.) Moreover, the undisputed facts of the record show that the promotional candidates ranked highly by Weymouth were frequently promoted. (*See* Fact ¶¶ 84-87.)

Even if Captains choose not to sit on promotional panels, they can, and do, offer promotional recommendations to the Fire Chief, either on their own accord or when solicited by the Fire Chief. (Fact ¶ 81.) For example, Spencer has written at least one letter of recommendation for a promotional candidate, and the Fire Chief followed Spencer's recommendation. (Fact ¶ 82.) The Fire Chief has also personally solicited Spencer's advice for three promotional candidates, and the Fire Chief ultimately followed all three of Spencer's recommendations. (Fact ¶ 83.) Accordingly, the Court finds that Captains' recommendations as to promotion are given particular weight.

54

Captains also have the opportunity, and in fact do, sit on hiring interview panels. (Fact ¶ 88.) For example, Redford sat on a hiring interview panel that interviewed thirty candidates and recommended that twelve be hired. (Fact ¶ 89.) The Fire Chief ultimately hired eleven of the twelve candidates recommended, with the twelfth declining the position. (Fact ¶ 89.) Accordingly, it is clear that Captains' recommendations as to hiring are given particular weight.

Captains are also given input as to the firing of HFD personnel. Since June 2011, HFD has only terminated the employment of one Firefighter due to poor performance. (Fact ¶ 95.) In that instance, a Captain first assisted with developing an improvement plan for the underperforming Firefighter. (Fact ¶ 95.) When the Firefighter failed to meet the expectations of the plan, the Captain recommended that his employment be terminated, and the Firefighter's employment was in fact terminated. (Fact ¶ 95.)

Moreover, Since June 2011, HFD has terminated the employment of three Firefighters due to on-duty misconduct. (Fact ¶ 102.) In two of the three instances, Captains recommended that the Firefighters be terminated. (Fact ¶ 102.) In the third instance, the termination was the automatic result of a failed drug test. (Fact ¶ 102.) Therefore, in the three instances of 'discretionary' termination due to poor performance or misconduct since June 2011, Captains' recommendations were followed in each instance. Accordingly, the Court finds that Captains' recommendations as to the firing of employees are given particular weight.

In the instant case, Plaintiffs have testified that Captains sit on promotion and hiring interview panels, that they have recommended promotions, and that they have recommended terminations. The Fire Chief has also testified that he personally considers the recommendations given to him. Furthermore, the record indicates that Captains' recommendations as to promotions, hiring, and firing are frequently followed. In short, Defendant has demonstrated through clear, convincing, and undisputed evidence that Captains' recommendations as to Employment Decisions

are given particular weight. The Court, therefore, finds that Plaintiffs satisfy the fourth factor of the Executive Exemption Test.

### v. Defendant has Demonstrated that Plaintiffs Satisfy the Four Factors of the Executive Exemption Test

As discussed above, Defendant has demonstrated through clear, convincing, and undisputed evidence that Plaintiffs satisfy the four factors of the Executive Exemption Test. Therefore, the Court finds that Plaintiffs are Exempt Executives within the meaning of the FLSA and are not entitled to receive overtime wages.

Accordingly, based on the undisputed facts and the Court's findings, and because "[t]he determination of whether an employee falls within the scope of a FLSA exemption is ultimately a legal question," *Walton*, 370 F.3d at 450, the Court finds that Defendant has properly classified Plaintiffs as Exempt Executive employees and RECOMMENDS that Plaintiffs' Motion for Summary Judgment (ECF No. 22) be DENIED and that Defendant's Motion for Summary Judgment (ECF No. 20) be GRANTED as to the issue of Defendant's alleged violation of the FLSA's Overtime Requirement.

### D. Recovery Period and Liquidated Damages

Because the Court finds that Defendant's Motion for Summary Judgment should be granted as to the issue of Defendant's alleged violation of the FLSA's overtime requirement, the Court also RECOMMENDS that Defendant's Motion for Summary Judgment (ECF No. 20) be DENIED AS MOOT as to the issues of recovery period and liquidated damages. While the Court finds that Defendant's damages arguments would be rendered moot by a ruling granting Defendant's Motion for Summary Judgment as to the issue of Defendant's alleged violation of the FLSA, the Court will nonetheless briefly address the issue of damages.

In pertinent part, the penalties section of the FLSA provides that "any employer who violates the [Overtime Requirement] shall be liable to the . . . employees affected in the amount of .

. . their unpaid overtime compensation . . . and in an additional equal amount as liquidated

damages." 29 U.S.C. § 216(b). The Court, however, may refuse to award liquidated damages if

Defendant proves that its violation of the FLSA was "in good faith and that [the employer] had

reasonable grounds for believing that [its] act or omission was not a violation of the [FLSA]." 29

U.S.C. § 260. For calculating damages, an employee's recovery period is typically limited to two

years; however, if the employee can prove that the employer acted willfully in violating the FLSA,

the employee is entitled to a three-year recovery period. *See* 29 U.S.C § 255(a).

### 1. Recovery Period

Under the FLSA, recovery is generally limited to two years of back pay—in this case,

unpaid overtime compensation. *See Perez v. Mountaire Farms, Inc.*, 650 F.3d 350, 375 (4th Cir.

2011) (citing 29 U.S.C. § 255(a)). Plaintiffs can, however, recover three years of back pay if they

prove that their employer willfully violated the FLSA. *Id.*; *see also Hantz v. Prospect Mortg., LLC*,

11 F. Supp. 3d 612, 616-17 (E.D. Va. 2014) ("The employee bears the burden of proof when

alleging that a violation is willful." (citing *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630

F.3d 351, 358 (4th Cir. 2011))). To prove willfulness, Plaintiffs must show that Defendant "knew

or showed reckless disregard for the matter of whether its conduct was prohibited by the statute."

*McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). "Mere negligence on the part of the

employer with regard to compliance with the FLSA is not sufficient to prove willfulness." *Hantz*,

11 F. Supp. 3d at 616-17. Therefore, Plaintiffs must demonstrate that Defendant acted recklessly,

not simply unreasonably, in classifying them as Exempt Executive employees. *See id.*

The Court finds that Plaintiffs have failed to demonstrate that Defendant acted recklessly in

classifying Captains as Exempt Executive employees. Plaintiffs argue, in part, that Defendant's

classification was a willful violation of the FLSA given that other Virginia localities, specifically

Chesterfield County, the City of Richmond, and the City of Petersburg, classify their captains as

Non-Exempt employees. (*See* Pls.' Resp. at 29-30; Pls.' Resp. Ex. 10.) As an initial matter, the

Court notes that the classifications given by other localities to their captains is largely irrelevant to

the analysis in the instant case involving Henrico County. While the determination of whether a

given employee is exempt from the FLSA Overtime Requirement is a question of law, the

underlying work that an employee performs is a question of fact. *See Icicle Seafoods, Inc.*, 475 U.S.

at 714. Accordingly, the facts as to what work captains perform in various localities may vary from

case to case. In other words, captains who perform different work may be classified differently

under the FLSA. For example, in the instant case, the facts suggest that captains in Chesterfield

County are assigned to the same shifts as firefighters and lieutenants, unlike Captains in Henrico

County who are assigned to different shifts from Firefighters and Lieutenants. (*See, e.g.*, Spencer

Dep. 123:2-124:8, ECF No. 21-12; Hughes Dep. 212:18-25, ECF No. 21-10 .) The Court,

therefore, is unconvinced that the fact that other Virginia localities classify their captains differently

demonstrates that Defendant willfully violated the FLSA.

Furthermore, the Court finds that the record does not suggest that Defendant recklessly

violated the FLSA. Indeed, the record indicates that Defendant carefully analyzed the new

regulations promulgated by DOL in 2004 and undertook a comprehensive, fifteen-month long

review to determine whether the new regulations would affect the classification of Captains. (*See*

Fact ¶¶ 103-10.) Defendant's HR Department consulted publications, attended seminars, and

contacted other Virginia localities in considering the effects of the First Responder Regulation.

(Fact ¶ 105.) The HR Department also considered a letter from DOL that opined that, following the

changes to the regulations, captains may still meet the requirements to be considered Exempt

Executives. (Fact ¶ 106.) Moreover, the HR Department reviewed the opinion of an outside law

firm that had opined that the regulatory changes would render Captains Non-Exempt. (Fact ¶ 107-

09.) In reviewed the law firm's opinion, the HR Department responded to each of the firm's

arguments and ultimately still concluded that Captains were properly classified as Exempt employees. (Fact ¶ 109.) Finally, the HR Department sought the advice of the County Attorney who also concluded that Defendant had properly classified Captains as Exempt employees. (Fact ¶ 110.)

Given the level of review conducted by Defendant, the Court cannot find that Defendant recklessly disregarded the mandates of the FLSA. The Court, therefore, finds that Plaintiffs have not proven that Defendant willfully violated the FLSA. Accordingly, the Court RECOMMENDS that Defendant's Motion for Summary Judgment (ECF No. 20) be GRANTED as to Plaintiffs' willfulness claim and further RECOMMENDS that any recovery should be limited to two years.

### 2. Liquidated Damages

In any action for the recovery of unpaid overtime compensation under the FLSA, employees are entitled to recover "liquidated damages in an amount equal to the unpaid overtime compensation." *Perez*, 650 F.3d at 375 (citing 29 U.S.C. § 216(b)). However, the Court may, in its sound discretion, refuse to award liquidated damages "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that [the employer] had reasonable grounds for believing that [its] act or omission was not a violation of the [FLSA]." 29 U.S.C. § 260. The Fourth Circuit has suggested that employers who "remain blissfully ignorant of FLSA requirements" or whose behavior may be characterized "as an ostrichlike attitude of self-delusion" may not defeat an award of liquidated damages. *See Burnley v. Short*, 730 F.2d 136, 140 (4th Cir. 1984) (citations omitted); *see also Hawks v. City of Newport News*, 707 F. Supp. 212, 216-17 (E.D. Va. 1988) ("[A]n employer may not remain blissfully ignorant of FLSA requirements."). Additionally, this Court has previously held that "ambiguity of the regulations at issue and the closeness of the question presented" weigh in favor of refusing to award liquidated damages. *See Thomas v. Cnty. of Fairfax*, 758 F. Supp 353, 368 (E.D. Va. 1991). Finally, this Court has held that

59

an employer acts in good faith when it "ma[kes] a conscientious effort to comply with the FLSA by conducting . . . studies of the executive status of fire captains and lieutenants." *Hawks*, 707 F. Supp. at 217.

In the instant case, the Court finds that Defendant has acted in good faith and, therefore, that liquidated damages should not be awarded. The record clearly demonstrates that Defendant did not "remain blissfully ignorant" of DOL's 2004 amendments to the regulations at issue. Rather, Defendant conducted a fifteen-month-long review to determine whether Captains should be reclassified as Non-Exempt in light of the new regulations. (*See* Fact ¶¶ 103-10.) Moreover, in conducting its review, Defendant specifically consulted with its HR Department and County Attorney, both of which concluded that Captains were properly classified as Exempt Executive employees. (*See* Fact ¶¶ 108, 110.) In reaching its conclusion that Captains were properly classified as Exempt, Defendant's HR Department consulted publications, attended seminars, contacted other Virginia localities, considered an opinion letter from DOL, and rebutted an opinion letter from a law firm. (Fact ¶¶ 105-08.) These actions are not indicative of "an ostrichlike attitude of self-delusion" and, therefore, weigh in favor of a refusal to grant liquidated damages. *Burnley*, 730 F.2d at 140. Moreover, the Court notes that the legal issues raised in this action have not been fully developed in the Fourth Circuit. Indeed, as discussed above, the Fourth Circuit has not yet addressed the interplay among the First Responder Regulation, the Executive Exemption Test, and the Primary Duty Test. These facts also weigh in favor of a refusal to grant liquidated damages.

Ultimately, therefore, based on the legal questions at issue, Defendant's fifteen-month-long review, and Defendant's reliance on opinions from its HR Department and County Attorney's Office, the Court finds that Defendant has acted in good faith and had reasonable grounds for classifying Captains as Exempt Executive employees. Accordingly, the Court RECOMMENDS that Defendant's Motion for Summary Judgment (ECF No. 20) be GRANTED as to the issue of

liquidated damages and specifically RECOMMENDS that liquidated damages not be awarded to Plaintiffs in this action.

## V. CONCLUSION

Having considered the Parties' motions, briefs, and oral argument, and for the reasons discussed above, the Court finds that there are no genuine disputes as to any material facts, that Defendant has demonstrated with clear and convincing evidence that it has properly classified Captains as Exempt Executive employees, that Defendant did not willfully violate the FLSA, and that Defendant classified Captains as Exempt Executive employees in good faith. Therefore, the Court ultimately finds that summary judgment should be entered in favor of Defendant.

Accordingly, the Court RECOMMENDS that Plaintiffs' Motion for Summary Judgment (ECF No. 22) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 20) be GRANTED IN PART as to the issue of Defendant's alleged violation of the FLSA's Overtime Requirement, that Defendant's Motion for Summary Judgment (ECF No. 20) be DENIED IN PART AS MOOT as to the issues of the recovery period and liquidated damages, and that JUDGMENT be ENTERED in favor of Defendant.

In the alternative, the Court RECOMMENDS that Summary Judgment be GRANTED in favor of Defendant as to Plaintiffs' willfulness claim, thereby limiting any recovery to two years, and further RECOMMENDS that Summary Judgment be GRANTED in favor of Defendant as to the issue of liquidated damages, thereby barring Plaintiffs from receiving liquidated damages in this action.

The Clerk is directed to file this Report and Recommendation electronically and send a copy to all counsel of record and to Robert E. Payne, Senior United States District Judge.

### NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

/s/

Roderick C. Young
United States Magistrate Judge

Richmond, Virginia
Date: August 31, 2015